# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-1102

XIA J. LIN,

*Petitioner*,

v.

JOHN D. ASHCROFT, Attorney General
of the United States,

*Respondent.*

———————

Petition to Review an Order of
the Board of Immigration Appeals.
No. A77 122 746

———————

ARGUED DECEMBER 8, 2003—DECIDED SEPTEMBER 22, 2004

———————

Before DIANE P. WOOD, EVANS, and WILLIAMS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* Xia J. Lin claims that the Chinese government forced her to abort two pregnancies under its coercive family planning policies and will subject her to involuntary sterilization if she is forced to return to China. Lin filed for asylum, withholding of removal, and protection under the United Nations Convention against Torture. The Immigration Judge (IJ) denied all relief because he concluded that Lin was not credible, a ruling the Board of Immigration Appeals (BIA) summarily affirmed.

We vacate the removal order and remand Lin's case for rehearing because the IJ's adverse credibility determination was not supported by substantial evidence.

## I

Lin is a 35-year-old native of Wenzhou City in the Zhejiang Province of China. At the age of 19, she married her husband, who was 22 at the time. Because Lin and her husband married before they had reached the legally permissible age—23 for women and 25 for men—they were unable to register their union for several years after the ceremony. To corroborate this fact, Lin submitted to the IJ an original copy of a marriage certificate issued in 1992, five years after the wedding. Lin and her husband both worked for state-owned enterprises, she as a store clerk and he as a factory laborer. Several months after they were married, Lin gave birth to a daughter. When she arrived at the hospital for the delivery, Lin was unable to produce the required "birth permit" because her marriage had not yet been registered with the government. Lin testified that she and her husband paid a fine of 50 Renminbi (RMB) to the hospital for failure to produce the birth permit and were assessed a fine of 14,400 RMB ($1,735) for having a child before Lin had turned 23 years of age. She corroborated this claim by submitting a copy of a fine for 50 RMB that gave as its stated reason "no birth permission," see A.R. 278, and a copy of another fine in the amount of 14,400 RMB which was assessed for "marrying too early; having child too early." *Id.*

Six months after her daughter was born, family planning officials inserted an intrauterine device ("IUD") in Lin to prevent future pregnancies. Because Lin and her husband wanted more children, she paid a private doctor to remove the IUD in February 1989, and became pregnant for the second time in March. Fearing that she would be forced to

abort her pregnancy, Lin fled to her brother's house and did not show up for her quarterly IUD checkup in May 1989. Although she tried to avoid detection by remaining indoors, Lin believes that somebody reported her pregnancy to family planning officials. Lin claims that eight people arrived at her brother's house one night to take her to the hospital for an abortion. Lin's relatives fought with the officials and Lin pleaded with them to allow her to bring her four-month pregnancy to term. These protestations fell on deaf ears as the officials took her "by force" to the Second People's Hospital of Wenzhou City, where doctors aborted her pregnancy.

One month after the first abortion, Lin was fined 1,000 RMB and had another IUD inserted. She attended her IUD checkups without incident until May 1995, when she again paid a private doctor to remove the contraceptive device. One month later, Lin became pregnant for the third time. Afraid to stay home while she was pregnant, Lin left her job and went to stay with her sister. She was tracked down by family planning officials shortly after she missed her IUD checkup in December 1995. Lin testified that the officials were "very aware" of her situation after the first abortion and that she believed someone had once again reported her unauthorized pregnancy to the government. This time about ten people arrived at her sister's home, again at night. When Lin refused to voluntarily submit, the officials took her to the Dongfeng Hospital for a second abortion. She was six months pregnant at the time. Lin explained to the IJ that she did not have evidence to show that the abortion was forced because such documentation is provided only for voluntary procedures. She testified: "If I could get evidence . . . that would prove to you that that abortion was voluntary. Because it was involuntary, I couldn't produce that evidence."

Lin returned home after the second abortion, for which she was fined 1,500 RMB, and had an IUD inserted again

by family planning officials in January 1996. She did not return to work. Her husband's employer threatened to dismiss him if Lin had any further problems with the family planning officials or became pregnant again. Despite this threat, Lin paid a private doctor to remove her IUD for the third time in September 1998. When she became pregnant shortly thereafter, she decided that it was time to leave China. With the assistance of smugglers, a pregnant Lin traveled through Thailand, Singapore, and Japan before arriving in the United States on May 3, 1999. After landing at the Los Angeles airport, Lin was detained and questioned by immigration officials. Because Lin did not have valid travel documents, the government instituted removal proceedings. Lin conceded removability and requested asylum, withholding of removal, and protection under the Torture Convention. With the assistance of counsel, Lin's case was transferred from California to New York, where Lin had moved to live with friends. Lin appeared briefly before an IJ in New York but requested a second venue change to Chicago after her move to Illinois. The government did not oppose either venue change and Lin's asylum hearing occurred in Chicago.

At her asylum hearing, Lin testified that she was nervous during her interview with immigration officials at the Los Angeles airport. She was worried about being sent back to China while she was pregnant. In her sworn statement from that interview, Lin said that she left China because it is against the law to have two children under the "one-child policy." She said that she was afraid to return to China because she would be arrested for leaving without permission. When asked about the "purpose of her trip," Lin responded: "Economy is bad in China and I am pregnant 7 months. [I] need to provide for my child in China. I am here to look for a job."

Lin told the IJ that her second child, a daughter born in the United States, had returned to China to live with Lin's

parents while she worked in America to pay off her $20,000 smuggling debt. Lin also explained that after she left China in April 1999, government officials informed her husband that their oldest daughter could not register for school until the hefty 14,400 RMB fine imposed at the child's birth was paid in full. To support this claim, Lin submitted a copy of the fine which was dated July 19, 1999.

The IJ denied Lin's request for asylum, withholding of removal, and relief under the Torture Convention based on an adverse credibility determination. (On appeal, Lin has abandoned her request for relief under the Torture Convention by failing to raise it in her opening brief. See, *e.g.*, *Hentosh v. Herman M. Finch Univ. of Health Scis./The Chi. Med. Sch.*, 167 F.3d 1170, 1173 (7th Cir. 1999) ("Arguments not raised in an opening brief are waived.") (citing *Wilson v. O'Leary*, 895 F.2d 378, 384 (7th Cir. 1990)).) The IJ determined that Lin's testimony was not believable and that she could not meet her burden of proof "without necessary corroboration of the incidents in the past." Specifically, the IJ gave two reasons for disbelieving Lin's story. First, he concluded that Lin's "sole motivation for coming to the United States was economic," rather than fear of China's coercive population control policies. In the IJ's estimation, the fact that Lin sent her second child back to China "undercut" her testimony that she was concerned about the consequences of having an unauthorized child. Second, the IJ decided that Lin's descriptions of her two forced abortions were implausible and were inconsistent with "general background reports." The IJ found it hard to believe that eight or ten people arrived to escort Lin to the hospital for her abortions. After making this credibility determination, the IJ further found that Lin had not sufficiently corroborated her alleged persecution through third-party affidavits. The IJ thought that Lin should have been able to produce this corroboration because she has remained in contact with her family in China.

## II

### A

When the BIA affirms an IJ's ruling without opinion, see 8 C.F.R. § 1003.1(e)(4), we review the IJ's decision directly. *Vladimirova v. Ashcroft*, 2003 WL 23676865, *5 (7th Cir. July 26, 2004). To qualify for asylum, Lin bears the burden of proving that she meets the statutory definition of "refugee" as provided in the Immigration and Nationality Act (INA). This definition generally provides that a refugee is "any person who is outside any country of such person's nationality . . . who is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." See 8 U.S.C. § 1101(a)(42)(A). This generally applicable definition has been amended to specifically account for applicants like Lin who allege persecution based on coercive family planning policies. See 8 U.S.C. § 1101(a)(42)(B). Withholding of removal is governed by a more stringent standard because Lin is required to show that there is a "clear probability" that her life or freedom would be threatened upon her return to China. See *INS v. Stevic*, 467 U.S. 407, 413 (1984); 8 U.S.C. § 1231(b)(3).

Under the substantial evidence standard, we uphold the IJ's determination if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Ahmed v. Ashcroft*, 348 F.3d 611, 615 (7th Cir. 2003). Although we are mindful of the highly deferential standard applied to the IJ's credibility determinations, "we will not automatically yield to the IJ's conclusions when they are drawn from insufficient or incomplete evidence." *Georgis v. Ashcroft*, 328 F.3d 962, 968 (7th Cir. 2003). To withstand our scrutiny, the IJ's credibility determination must be supported by "specific, cogent reasons" that "bear a legitimate

nexus to the finding." *Krouchevski v. Ashcroft*, 344 F.3d 670, 673 (7th Cir. 2003) (quoting *Ahmad v. INS*, 163 F.3d 457, 461 (7th Cir. 1999) (internal citations and quotation marks omitted)). We have explained that "[c]orroborating evidence is essential to bolster an otherwise unconvincing case, but when an asylum applicant does testify credibly, it is not necessary for her to submit corroborating evidence in order to sustain her burden of proof." *Uwase v. Ashcroft*, 349 F.3d 1039, 1041 (7th Cir. 2003) (internal citation and quotation marks omitted); see also 8 C.F.R. § 208.13(a) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.").

Because an applicant who fails to establish eligibility for asylum necessarily cannot satisfy the more stringent requirements for withholding of removal, we begin with Lin's asylum claim.

**B**

Congress has maintained an interest in asylum applicants like Lin from the time China first implemented its controversial "one-child" policy in 1979. In 1985, the House of Representatives condemned the policy, and Congress restricted appropriations to any organization that supported or participated in a program of coercive abortion or involuntary sterilization. See *Population Inst. v. McPherson*, 797 F.2d 1062, 1064-67 (D.C.C. 1986) (providing history of Congressional action in the 1980s). Noting these developments, the BIA nonetheless determined that an asylum applicant subject to China's one-child policy could not allege persecution on one of the five permissible grounds enumerated in the INA. *Matter of Chang*, 20 I. & N. Dec. 38, 44-47 (B.I.A. 1989). Federal courts deferred to the BIA's interpretation despite subsequent legislative and administrative action that attempted to overturn *Chang*. See *Chen v. INS*, 95 F.3d 801, 804-07 (9th Cir. 1996) (holding that *Chang* had

not been overruled by administrative action or executive order); *Zhang v. Slattery*, 55 F.3d 732, 737 (2d Cir. 1995), *cert. denied*, 516 U.S. 1176 (1996) (upholding *Chang* despite the "seemingly purposeful efforts by the executive branch and the houses of Congress to achieve the opposite outcome"); *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1340 (4th Cir. 1995) (finding that subsequent executive action "does not prevent the Board of Immigration Appeals from applying *Matter of Chang* as controlling precedent.").

Following a series of hearings in 1995, Congress finally succeeded in reversing the *Chang* decision. See *Coercive Population Control in China: Hearings Before the Subcomm. on Int'l Operations and Human Rights of the House Comm. on Int'l Relations*, 104th Cong. 2 (1995) (statement of Rep. Chris Smith, Chair) ("I am proud to report that legislation drafted and marked up . . . would make it clear once and for all that the United States will not send people back to forced abortions, will not send people back to forced sterilizations."). The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) amended the statutory definition of a "refugee" by adding the following sentence:

> For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

Pub. L. No. 104-208, § 601(a)(1), 110 Stat. 3009-689 (1996) (codified as amended at 8 U.S.C. § 1101(a)(42)(B)).

A careful reading of the amendment reveals that Congress identified four separate conditions under which an asylum applicant may allege past persecution on account of political opinion: (a) the applicant has been forced to abort a pregnancy, (b) the applicant has undergone involuntary sterilization, (c) the applicant has been persecuted for failing or refusing to undergo such a procedure, or (d) the applicant has been persecuted for other resistance to a coercive population control program. Further, the amendment states that an asylum applicant can allege a well-founded fear of future persecution: (a) if the applicant fears being forced upon return to undergo an abortion or sterilization procedure or (b) if the applicant fears persecution for failure, refusal or resistance. The BIA acknowledged the legislative reversal of *Chang* in *In re X-P-T*, 21 I. & N. Dec. 634, 636-38 (B.I.A. 1996), when it granted asylum and withholding of removal to a Chinese alien who had been forcibly sterilized. It later extended these protections to the spouse of such an individual, *In re C-Y-Z*, 21 I. & N. Dec. 915, 919-20 (B.I.A. 1997). See also *Zhao v. Reno*, 265 F.3d 83, 95 (2d Cir. 2001).

As we stated before, it is Lin's burden to establish that she is a refugee under the amended statutory definition. See 8 C.F.R. § 208.13(a). In this case, she alleges that the two forced abortions, three IUD insertions, and numerous fines assessed by the Chinese government constitute persecution. Taking our lead from the statute's text, we first examine Lin's allegation that she was forced to abort two pregnancies, one in 1989 and the other in 1995. Lin concedes that she has no documentary evidence to corroborate her claim that the two abortions were forced. (The fact of the abortions, as opposed to their voluntary or forced nature, is uncontested.) In fact, she testified that she could not be expected to produce such evidence as documentation is provided only when the abortion is voluntary. Thus, Lin's claim stands on her testimony, which the IJ found to be incredible.

The IJ concluded that Lin's descriptions of her forced abortions were "inconsistent with general background reports concerning pressure on women to only have one child in urban areas." We can only understand this to mean that the IJ believed that women from urban areas, like Lin, are under pressure to have only one child. We are confused, however, by what the IJ found to be "inconsistent" between Lin's account of her forced abortions and the IJ's understanding that women in urban areas *are* pressured to only have one child. Furthermore, the IJ's reference to "general background reports" does not give us confidence that he consulted the State Department report in the record, because that report corroborates, rather than undermines, several aspects of Lin's testimony.

The State Department's Profile of Asylum Claims and Country Conditions for China (Profile) reports that the one-child policy remains officially in force and most heavily affects the urban population. Most asylum claims come from three Chinese provinces, including the Zhejiang Province where Lin lived with her husband. Chinese officials privately acknowledge that forced abortions and sterilizations still occur in areas where family planning personnel may be uneducated and ill-trained. Employees of government-owned enterprises, like Lin and her husband, are subject to particularly strict controls. See also *Wang v. Ashcroft*, 341 F.3d 1015, 1018 & n.1 (9th Cir. 2003) (noting strict enforcement of population control policies against government employees). The Profile further corroborates Lin's testimony that married couples from the Zhejiang Province are authorized to have a child only after the wife reaches the age of 23. Most crucially, the Profile confirms Lin's explanation that any evidence she might produce of an abortion would imply that the procedure was voluntary as opposed to forced:

> The U.S. Embassy and Consulates are unaware of any so-called "abortion certificates," which often are pre-

> sented as part of asylum applications as evidence of a forced abortion. According to Embassy officials, the only document that might resemble such a certificate and result in confusion is a document issued by hospitals upon a patient's request after a voluntary abortion. This certificate is used by patients as evidence to request 2 weeks of sick leave after an abortion has been performed, a right provided by law.

While these statements in the Profile lend credence to Lin's story, the government points to other statements that appear to undermine her claim of persecution. Specifically, the government argues that Lin could not have been forced to undergo abortions because, according to the Profile, Zhejiang Province allows married couples to have a second child if the first is female. If that is true, then Lin and her husband would have been permitted to have a second child after the birth of their daughter. But the government did not ask Lin about this policy in her hearing before the IJ; instead, it raised this argument for the first time on appeal. It is thus not evidence on which the IJ relied, nor can the government now introduce it into the record. On remand, both Lin and the government will have the opportunity to present evidence regarding the applicability of this policy to Lin. While the country Profile is entitled to deference, it cannot serve as a substitute for the individualized determination required of the IJ in Lin's case. See, *e.g.*, *Bace v. Ashcroft*, 352 F.3d 1133, 1139 (7th Cir. 2003) ("[I]t would be improper to find that a witness's testimony about specific events could be 'contradicted' by a generalized State Department report broadly discussing conditions in the applicant's country of origin."); *Toptchev v. INS*, 295 F.3d 714, 723 (7th Cir. 2002) (explaining that the BIA is entitled to consider State Department reports so long as it undertakes a "particularized review of the petitioners' case."). In sum, the IJ's decision did not reflect consideration of the relevant country conditions and rested on perceived incon-

sistencies between Lin's testimony and the general background reports, which we have shown actually corroborated key aspects of her story.

The IJ's credibility determination also rested on a conclusion that Lin's descriptions of the forced abortions were implausible. With respect to the first abortion, the IJ found it difficult to believe that authorities located Lin after she moved to her brother's house and that family planning officials would send eight officials to detain her. The IJ also found that Lin's description of her second abortion "lack[ed] the details and plausibility necessary to be believable" because Lin was not specific enough about how she was detected a second time, why the authorities would send ten people to find her, and whether her family was threatened if she refused to undergo the abortion. We examine each of these findings in turn.

First, the IJ believed that Lin was not specific enough about how family planning officials detected her after she fled to her brother's house during her second pregnancy and her sister's house during her third pregnancy. In the case of both abortions, Lin testified that government officials tracked her down shortly after she failed to show up for her required IUD checkups. Lin testified that enforcement of these checkups was "strict," and it is perfectly reasonable to assume that her absence alerted family planning officials to a potential problem. In 1998, Congress heard testimony from a former Chinese family planning official who explained that when a woman fails to arrive for a "contraceptive device reliability" examination, like an IUD checkup, she is "apprehend[ed]" by a supervision team, forced to have the examination, and assessed a fine. See *Forced Abortion and Sterilization in China—The View from Inside: Hearings Before the Subcomm. on Int'l Operations and Human Rights of the House Comm. on Int'l Relations*, 105th Cong. 8-12 (1998) [hereinafter 1998 Hearings] (testimony of Ms. Gao Xiao Duan, Former Administrator, Planned Birth Control

Office, People's Republic of China). http://
commdocs.house.gov/committees/intlrel/hfa49740.000/hfa
49740_0.htm. This account mirrors that provided by Lin.

Additional factors provide further support for Lin's expla-
nation of why she was easily detected by the government.
Lin explained to the IJ that "after the first incident, they
[were] very aware of my situation and in the area, there are
people, you know, who report the situation, who report to
the government like me." Lin's status as a government
employee, along with the suggestion that her husband's
employer was aware of her problems with family planning
officials, bolsters her contention that she was being closely
monitored. See also 1998 Hearings at 3 (describing a net-
work of paid informants used to enforce the one-child pol-
icy). Finally, the fact that Lin received a fine for giving
birth while underage likely brought her to the attention of
family planning officials early on. In short, the IJ's determi-
nation that Lin had failed sufficiently to explain how she
was detected is not supported by substantial evidence.

Second, the IJ also took issue with Lin's statement that
eight people escorted her to the hospital for the first
abortion and that ten people accompanied her to the second
one. The IJ found that Lin did not plausibly explain why
such a large group arrived when a single individual could
have made an initial inquiry. With respect to the first
incident, Lin explained that some individuals were from the
family planning authority and some were from the local
police station. Lin alleges that the officials took her by force
after she refused to submit voluntarily. In *He v. Ashcroft*,
328 F.3d 593 (9th Cir. 2003), the IJ had discredited peti-
tioner He's testimony that "a group of ten, or possibly more,
officials arrived at his house" to take his wife for an invol-
untary sterilization. *Id.* at 595. The Ninth Circuit granted
He's petition for review and remanded the case to the BIA.
After suggesting that this large group may have been sent
to ensure that He and his wife would not escape, the Ninth

Circuit stated: "Moreover, despite the IJ's obvious skepticism, Mr. He remained consistent and steadfast on a factual point that did not make that much difference to the truth of his claim. Whether five or ten people came to take his wife for involuntary sterilization it would nonetheless have been involuntary." *Id.* at 600. Likewise, we find that Lin testified consistently with respect to the number of people who took her to the hospital against her will—a factual point that has little bearing on whether she was forced to abort her pregnancies. When eight people arrived on the first occasion, Lin's relatives fought with them and Lin refused to submit voluntarily to an abortion. Under these circumstances, it is perhaps unsurprising that a larger group would be sent the second time. The officials could have believed that Lin would run away or that her family would obstruct their plans. We note parenthetically that there is evidence to suggest that family planning "supervision teams," some as large as a dozen, conduct "night raids" that involve encircling the violator's house to prevent an escape. See 1998 Hearings at 10-11. Furthermore, we question the relevance of the IJ's disbelief regarding the number of individuals that arrived to detain Lin. She testified consistently on a point that has little legitimate bearing on whether her abortions were involuntary. The IJ's skepticism—utterly unsupported by any facts in the record—with respect to this detail of her story does not form a valid basis for a negative credibility determination, in the face of the other corroborating information she presented.

Third, the IJ suggested that Lin's description of her second abortion was implausible because she did not sufficiently explain whether her family was threatened if she refused to undergo the abortions. Since Lin was taken against her will, it is not clear what any threats against her family members would have revealed to the IJ. We note in any event that Lin's family fought with the authorities both times that they arrived to take her to the hospital and that

her husband was threatened and eventually dismissed from his job because of her actions.

Finally, we can quickly dispense with the IJ's conclusion that Lin was fleeing China for economic reasons rather than fear of China's coercive population control policies. He based this conclusion on Lin's statements to immigration officials upon her arrival to Los Angeles and on Lin's decision to send her second child back to China while she remained in the United States. We find nothing troubling about Lin's sworn statement to immigration officials. She unequivocally stated that she feared returning to China because her pregnancy violated the one-child policy. Her reference to the weak economy in China was made as she reiterated that she was seven months pregnant and needed to provide for her children.[1] Likewise, we find the IJ's concern about Lin's decision to send her child back to China misplaced. There is no evidence to suggest that the U.S.-citizen second child would suffer at the hands of Chinese officials as a result of Lin's actions.

Viewing the record as a whole, we find that Lin's testimony was internally consistent, both with respect to the substance and the chronology of events that occurred from

---

[1] Although we do not find any inconsistencies in the statement that Lin made to immigration officials at the Los Angeles airport, we observe that this interview was conducted in Mandarin. Although Lin claims that she is capable of communicating in Mandarin, she is more comfortable speaking in the Wenzhou dialect. At her hearing before the IJ, Lin was provided with a Wenzhou translator. This court has cautioned against adverse credibility determinations based on alleged inconsistencies that arise from statements the applicant has made in two different languages. See *Ememe v. Ashcroft*, 358 F.3d 446, 452-53 (7th Cir. 2004) (remanding because the record did not establish whether the variances in applicant's testimony "represent a purposeful modification of her story, or merely the opportunity to better communicate it through her native language").

1987 through 1999. The IJ's determination that Lin's testimony was implausible for failure to provide specifics on three aspects of her forced abortions is not supported by substantial evidence. She provided ample detail to explain why and how she was detained during her second and third pregnancies. She was also resolute in explaining that she left China because of the one-child policy. The IJ's stated reasons for disbelieving Lin's descriptions are not based on cogent reasons, and therefore we conclude that its adverse credibility finding is not supported by "reasonable, substantial, and probative evidence." *Elias-Zacarias*, 502 U.S. at 481.

We now turn to the issue of corroboration. Despite the consistency of Lin's testimony, the IJ found that Lin had insufficiently corroborated her past treatment through third-party affidavits. We have repeatedly emphasized that corroborative evidence is *not* necessary when the applicant's testimony is otherwise credible. *Balogun v. Ashcroft*, 374 F.3d 492, 501-02 (7th Cir. 2004); *Uwase*, 349 F.3d at 1041; *Georgis*, 328 F.3d at 969. In this case, however, Lin did corroborate several aspects of her testimony, including the circumstances surrounding her early marriage and first pregnancy, by submitting the original copies of fines and certificates. She explained why she could not corroborate the forced abortions in a manner consistent with the State Department reports. We are left to guess exactly what else the IJ felt was necessary. Although the government suggested at oral argument that affidavits from her family members could have supported Lin's case, we are hard pressed to believe that these affidavits would have convinced the IJ that Lin's testimony was credible. The IJ's demand for additional corroboration in this case ignores the substantial evidence already in the record, both general and specific to Lin's case.

Accordingly, we remand for reconsideration of whether Lin's claim that she was forced to abort two pregnancies

constitutes past persecution as contemplated by the amended definition of "refugee." See *In re Y-T-L-*, 23 I. & N. Dec. 601, 606 (B.I.A. 2003) (en banc) ("It is manifestly clear that Congress intended to make eligible for asylum those who were victims of China's coercive family planning policy, not simply those who could be victims if returned to China."). Based on his adverse credibility determination, the IJ failed to reach a number of other issues raised by Lin's application. The IJ did not determine whether Lin's three involuntary IUD insertions and mandatory checkups could constitute persecution as a "coercive population control program" under the amended statutory definition or whether Lin's efforts to have the IUDs removed by private doctors is the type of "resistance" that Congress sought to protect, see *Li v. Ashcroft*, 356 F.3d 1153, 1160 (9th Cir. 2004) (en banc) (finding that vocal and physical resistance to a forced pregnancy examination meets the statutory definition). We recognize in advance that it may be difficult for Lin to obtain corroboration of these illegal acts. See, *e.g.*, Xiaorong Li, *License to Coerce: Violence Against Women, State Responsibility, and Legal Failures in China's Family-Planning Program*, 8 Yale J. L. & Fem. 145, 171-72 (1996) (explaining that the removal of IUDs from women of childbearing age without the permission of family planning authorities is punishable as a crime).

The IJ also failed to determine whether Lin's fear of involuntarily sterilization if she is returned to China constitutes a well-founded fear of future persecution. If Lin succeeds in establishing that she has been persecuted under the amended statute, she is automatically entitled to the presumption of a well-founded fear of future persecution. See 8 C.F.R. § 1208.13(b)(1). Even if Lin fails to establish past persecution, the IJ must independently consider whether she has presented an objectively reasonable fear of involuntary sterilization or other forms of persecution recognized under our asylum laws.

### III

We are not holding here that every woman of child-bearing age in China will automatically be entitled to asylum in this country, because they are all potentially subject to the coercive family planning policies. We find only that in the particular circumstances Lin has shown, where she testified that she endured two forced abortions and fears forced sterilization, where her testimony is consistent with the State Department Profile, and where she has supported her claim with relevant documentation, Lin as an individual may be entitled to this relief. We therefore VACATE the removal order and REMAND for further proceedings consistent with this opinion. We recognize that the BIA exercises discretion in selecting a presiding judge. However, we urge the BIA to assign a different judge to Lin's case on remand. *Cf.* Circuit Rule 36 of the United States Court of Appeals for the Seventh Circuit. *See also Kerciku v. INS*, 314 F.3d 913, 919 (7th Cir. 2003); *Georgis*, 328 F.3d at 970.

EVANS, *Circuit Judge*, concurring in part, dissenting in part. The majority opinion is beautifully written and quite persuasive. Yet, despite the fact that it concludes by saying we are "not holding here that every woman of childbearing age in China will automatically be entitled to asylum in this country, because they are all potentially subject to the coercive family planning policies," I think, as a practical matter, we are either doing, or coming close to doing, just that. How is Lin's case going to be different from that of any other Chinese woman who takes issue with China's policy and

arrives here saying she does not want to submit to its population control policy?

No doubt, Lin's story (if true) is quite compelling. Who would want the state to force a woman to have an abortion? On the other hand, China has a huge population problem, and there are people who applaud efforts to fix it. But when Congress, in 1996, amended the law to add forced abortion as a ground for granting refugee status, it made a value judgment about China's population control policy. That is interesting because it looks a bit like the congressional anti-abortion faction outmaneuvered its anti-immigration faction—which itself is ironic, given that most members of Congress who belong to one of the factions belong to the other as well.

Given the present state of law, it seems that every Chinese woman of childbearing age who says, to quote the words of the statute, that she is in a state of "resistance to a coercive population control program," can only be denied asylum in America if her story is incredible. As a practical matter, that's pretty hard to establish. So, given the present state of the law, the floodgates are probably open.

Finally, although I join Judge Wood's opinion, I do disagree on one point—I do not join the suggestion that the BIA should, upon remand, assign this case to a different immigration judge. We should not be making gratuitous suggestions of that sort.

A true Copy:

      Teste:

                                 _____
                                 *Clerk of the United States Court of Appeals for the Seventh Circuit*