# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 04-1706

JUNSHAO ZHANG,

*Petitioner-Appellant,*

*v.*

ALBERTO R. GONZALES, Attorney General
of the United States of America,
and DEPARTMENT OF HOMELAND SECURITY,[1]

*Respondents-Appellees.*

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A73-488-569

ARGUED APRIL 12, 2005—DECIDED JANUARY 19, 2006

Before MANION, ROVNER, and WILLIAMS, *Circuit Judges.*

ROVNER, *Circuit Judge.* Junshao Zhang, a native of the People's Republic of China, arrived in the United States at New York's JFK airport in January 1995, at which time he was placed in exclusion proceedings. The government alleged that Zhang lacked a valid passport, visa or

---

[1]  Pursuant to Federal Rule of Appellate Procedure 43(c)(2), we have substituted the current Attorney General of the United States, Alberto R. Gonzales, for his predecessor as the named respondent.

border-crossing card in violation of §§ 212(a)(7)(A)(i)(I), (B)(i)(I), and (B)(i)(II) of the Immigration and Nationality Act (INA), and that he presented a fraudulent passport to seek to gain entry into the United States in violation of INA § 212(a)(6)(C)(I). Zhang sought political asylum and withholding of deportation to China.[2]

At the immigration hearing, Zhang admitted the allegations regarding the lack of a non-immigrant visa, lack of an immigrant visa, and lack of a travel document, but denied the allegation of fraud under § 212(a)(6)(C)(i). The government subsequently withdrew the fraud charge, which the immigration judge (IJ) acknowledged at the hearing. The IJ held that Zhang's excludability was established by his admissions as to the other charges, and turned to Zhang's request for asylum and withholding of deportation. After hearing Zhang's testimony, the IJ found that Zhang's claim was based principally on his opposition to the forced family planning regulations in China, and his experience as a victim of that policy in China. The IJ found that Zhang's testimony was credible, and made findings of fact based on that credibility assessment. Specifically, the IJ found that: Zhang is opposed to the Chinese birth control policy; Zhang and his wife had a marriage ceremony at home, but never officially registered the marriage because he was under the age of 22 and she was under the age of 20, which are the legal ages of marriage for males and females respectively in China; in June of 1994, his wife was detained by Birth Control Bureau personnel and was forced to have an abortion because she was underage; and his wife was held for 2 days, and Zhang was ordered to pay a fine.

---

[2] Zhang later sought relief under the United Nations Convention Against Torture as well, but he did not challenge the denial of that relief in the opening brief to this court and therefore it is not before us.

Although crediting Zhang's testimony and finding those facts in his favor, the IJ nevertheless denied the requested relief based on *Matter of Chang*, 20 I. & N. Dec. 38 (BIA 1989). In *Chang*, the Board held that implementation of the one-child policy does not, by itself, create a well-founded fear of persecution based on race, religion, nationality, membership in a particular social group, or political opinion. Accordingly, the IJ held that Zhang was statutorily ineligible for a grant of asylum.

Congress subsequently enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, 110 Stat. 3009, 3009-546 (IIRIRA). Section 601(a)(1) of the IIRIRA amended the definition of refugee by providing:

> (A) [a] person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well-founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well-founded fear of persecution on account of political opinion.

§ 101(a)(42) of the Act, 8 U.S.C. § 1101(a)(42) (Supp. II 1996). The impact of that amendment was to overrule *Chang*, and allow for the granting of asylum applications in cases in which the claim of persecution stemmed from the enforcement of China's coercive population control policies.

After the enactment of that amendment, the Board was presented with requests by many asylum applicants to reopen their cases. Many of those motions to reopen were untimely because the change in law came after the time for reopening had expired. *See* 8 C.F.R. § 3.2(c); *In re*

*X.G.W.*, 22 I. & N. Dec. 71 (1998). The Board nevertheless recognized the Congressional desire to provide relief to individuals suffering persecution because of China's coercive population control policies. Accordingly, the Board declared that it would exercise its "limited discretionary powers under the regulations to reopen or reconsider cases *sua sponte* in unique situations where it would serve the interest of justice." *Id.* at 73. Specifically, the Board held that it would grant reopening of asylum claims based on coercive family planning policies where the alien had presented persuasive evidence of persecution based on China's "one-couple, one child" policy, and where asylum had previously been denied based on *Chang*. *X-G-W*, 22 I. & N. Dec. at 74. The Board in *X-G-W* granted reopening on that basis, and granted the application for asylum. *Id.*

In 2002, the Board in *In re G-C-L*, 23 I. & N. Dec. 359 (2002), declared that its liberal reopening policies for such untimely claims would end in 90 days, reasoning that those with final orders of exclusion or deportation had been provided a reasonable period of time in which to seek relief during the five years in which untimely reopening was allowed. The Board proceeded to consider the applicant's claim in *G-C-L*. The Board began by accepting the Immigration Judge's positive credibility finding. *Id.* at 361. Given that credibility finding, the Board held that the applicant had established that he suffered past persecution in China on account of political opinion, and was thus presumed to have a well-founded fear of future persecution. *Id.* Although that presumption could be rebutted by a showing that there had been a fundamental change in circumstances such that the applicant no longer had a well-founded fear of persecution if returned to China, the INS had not offered any such rebuttal evidence and therefore the Board granted the application for asylum. *Id.*

Zhang moved to reopen his case within the window of time in which the Board was allowing such reopening. The

Board determined that Zhang had established *prima facie* eligibility for asylum based on the new definition of "refugee" in the IIRIRA, and remanded the case to an IJ to consider the claim under current law and for entry of a new decision.

Rather than rely on the fact findings by the prior IJ, and update the record as to any changes in circumstances in the interim, the IJ conducted a new hearing at which he made new fact findings contrary to those determined in that initial hearing. First, the IJ questioned whether Zhang was married at all, not because he found Zhang's testimony inherently incredible, but because Zhang presented no corroborating evidence from his former spouse (Zhang testified that after he left China, his wife moved to another town and eventually remarried.) Even assuming that a marriage ceremony took place, the IJ held that Zhang had the burden to establish that the ceremony constituted a marriage under Chinese law, and that he had failed to do so.

The IJ also held that Zhang had failed to prove by credible evidence that his wife had been subjected to a forcible abortion. The IJ declared that there was reason to doubt Zhang's description of what happened to his wife because there was no corroboration for it from others such as his wife, nor any hospital record produced of the abortion. Moreover, the IJ held that Zhang's testimony was at variance with the State Department Profile of Asylum Claims and Country Conditions, and the Immigration and Nationality Directorate of the U.K. Finally, the IJ noted that the initial immigration judge had found Zhang's testimony credible and his demeanor appropriate in 1995, but the IJ then reached the opposite conclusion at this hearing. The IJ noted that Zhang gave answers quickly and readily on direct examination, but was more hesitant and claimed very often not to remember on cross-examination and when questioned by the Court. As an example, the

Court noted his responses when questioned as to what he told the immigration officers in 1995. The IJ questioned Zhang at length concerning his use of a fraudulent passport at entry, and did not believe Zhang's answers. Accordingly, the IJ held that Zhang intentionally misled the immigration officer upon his arrival in the United States, claiming to be a person he was not. The IJ concluded that Zhang was subject to inadmissibility under § 212(a)(6).

The denial of asylum in this case, then, is based almost entirely on the IJ's adverse determination of issues that had already been adjudicated in Zhang's favor at the earlier hearing. The IJ's questioning at the hearing, and the ultimate decision, dwelled at length on the fraud allegations under § 212(a)(6), a charge the government had withdrawn in the first proceeding. We have made clear that although an IJ may find an applicant not credible when he uses false documents to establish an asylum claim, " 'the use of false documents to facilitate travel or gain entry does not serve to impute a lack of credibility to the petitioner.' " *Dong v. Gonzales*, 421 F.3d 573, 577 (7th Cir. 2005), *quoting In re O-D-*, 21 I. & N. Dec. 1079, 1081 (BIA 1998). Accordingly, the IJ improperly relied on the entry documents as a basis to find Zhang incredible in his asylum claim.

Moreover, the IJ erred in even considering the withdrawn fraud charge. Zhang would have had no reason to believe that the fraud allegations would surface at all, given the remand order that directed the judge to consider the claim under the law as changed by the amendment superceding *Chang*. That amendment has nothing to do with § 212(a)(6), addressing only the impact of a forcible abortion or sterilization on a person's asylum claim. Rather than apply the new law to the fact findings, however, the IJ raised and considered a legal issue expressly withdrawn years earlier, and which the prior IJ recognized as a non-issue. We have previously noted that "when a case is reassigned to a new judge, 'the successor judge should generally not reexamine

earlier rulings merely because he has a different view of the law or facts than the original judge.'" *Sun Hee Ko v. Gonzales*, 421 F.3d 453, 455 (7th Cir. 2005) (quoting the Board of Immigration Appeals). Nothing in the remand order implicated the earlier voluntary resolution of the fraud issue, and the IJ erred in resurrecting it. "Litigants have a right to expect that a change in judges will not mean going back to square one." *Williams v. Commissioner of Internal Revenue*, 1 F.3d 502 (7th Cir. 1993); *Ko*, 421 F.3d at 456. In this case, the transfer of the case to Chicago had precisely that result, as the IJ based his ruling largely on an issue unrelated to the remand order, which had already been resolved by the prior IJ.

Those concerns apply to the IJ's determination regarding the marriage and the abortion as well. The initial IJ held that Zhang testified credibly, and made explicit fact findings that Zhang and his wife had been married and that his wife was forced to undergo an abortion because they were underage at the time of the marriage and pregnancy. The government did not present any new evidence casting doubt on those fact findings. In fact, the IJ reached the opposite conclusion based entirely on the IJ's own impressions of credibility and the failure of Zhang to provide corroborating evidence. Given the fact findings by the initial IJ and the remand order indicating that the case was remanded to consider it in light of the change in law, however, there was no reason for Zhang to believe that those factual issues would be determined anew, and that corroboration would be required. Unlike issues such as a change in circumstances that could impact whether he faced a threat of future persecution, the validity of the marriage and the forcible abortion were not issues that the passage of time would have changed, absent new evidence or some reason to believe that the earlier IJ had clearly erred. In fact, in other cases in which motions to reopen were granted in light of the amendment superceding *Chang*, the Board

decided the issue itself without any new hearing at all, giving deference to the initial IJ's fact findings. *See G-C-L*, 23 I. & N. at 361; *X-G-W*, 22 I. & N. at 73-4. The law of the case doctrine cautions against such inconsistent rulings based merely on the judges' differing impressions of credibility, absent exceptional circumstances such as a change in the law, new evidence, or compelling circumstances. *See generally Key v. Sullivan*, 925 F.2d 1056, 1060 (7th Cir. 1991); *Ko*, 421 F.3d at 455-56; *Ramos v. Gonzales*, 414 F.3d 800, 803 (7th Cir. 2005) and *Pilch v. Ashcroft*, 353 F.3d 585, 586-87 (7th Cir. 2003) (acknowledging law of the case doctrine in immigration context). In fact, the applicability of the doctrine has been recognized in the Operating Policies & Procedures Memoranda (OPPM) of the Office of the Chief Immigration Judge, United States Department of Justice Executive Office of Immigration Review. OPPM 01-02. That OPPM declares that "the law of the case doctrine is consistent with all existing immigration laws and regulations," and that it "shall apply" where there has been a change in venue. *Id.* at 2. In such circumstances "the receiving judge is not free to hear the case de novo and ignore any orders prior to the venue change, unless exceptional circumstances . . . permit departure from this policy." *Id.* Those exceptional circumstances include a supervening rule of law, compelling or unusual circumstances, new evidence, or such clear error in the previous decision that its result would be manifestly unjust. *Id.* None of those exceptional circumstances are present here. The amendment superceding *Chang* affected only the application of the law to the earlier fact findings concerning the marriage and the abortion, not the legal prerequisites for making those fact findings. Moreover, there was no new evidence or other compelling circumstances which accounted for the IJ's contrary determination. The IJ's mere difference of opinion regarding credibility is not enough to overcome law of the case concerns, and the prior determinations should have been given deference.

In any case, the reasons for the adverse credibility determinations in this case are unsupportable, and therefore the IJ decision cannot stand on that basis alone. First, the IJ determined that Zhang was not actually married because he failed to provide corroborating evidence of the marriage and because he failed to establish that the marriage was valid under Chinese law. Under the REAL ID Act of 2005, "no court shall reverse a determination made by a trier of fact [in a removal case] with respect to the availability of corroborating evidence . . . unless the court finds . . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." 8 U.S.C. § 1252(b)(4). We recently discussed the impact of that provision:

> All that this means is that an immigration judge's determination that if there was evidence to corroborate the alien's testimony the alien could and should have presented it is entitled to reasonable deference. The precondition to deference is that the immigration judge explain (unless it is obvious) why he thinks corroborating evidence, if it existed, would have been available to the alien. [citations omitted] . . . To be entitled to deference, a determination of availability must rest on more than implausible assertion backed up by no facts.

*Hor v. Gonzales*, 421 F.3d 497, 500-01 (7th Cir. 2005). Accordingly, in *Hor* we rejected the IJ's demand for corroboration of an alien's tale of abuse in the form of affidavits by co-workers, because the IJ gave no explanation for thinking the co-workers would provide such affidavits in light of the murderous nature of the group involved in the abuse. *Id.* at 501. Similarly, the *Hor* court rejected the IJ's demand that Hor provide copies of documents he had filed in court in Algeria, noting that there was no reason to doubt that Hor did not possess such copies and that we cannot presume that such copies are as readily available in disordered

nations as in the United States. *Id.* Similarly, the IJ's determination that the affidavit from his former wife was "available" to Zhang was based solely on unsubstantiated, implausible assertions by the IJ without any record support. Zhang explained at the hearing that his wife was angry at him for leaving China, and that she moved from the area and had remarried. He testified that his sister had contacted his wife's family and they had told the Zhangs not to contact them anymore. The IJ does not mention this testimony in faulting Zhang for failing to provide a statement of the marriage from his wife. Considering that his wife had remarried and lived in a different town, it is not at all surprising that she would not want to have contact with him. The IJ should have at least addressed that testimony in faulting Zhang for failing to obtain corroboration.

Despite the IJ's misgivings concerning the marriage, the IJ assumed that a ceremony took place but held that Zhang had failed to establish that the ceremony constituted a marriage under Chinese law. That is a Catch-22. Zhang's asylum claim is based on China's enforcement of its population control policy, part of which includes a minimum age requirement for marriages, and a minimum age for having children. The forcible abortion in this case occurred precisely because Zhang and his wife married and became pregnant prior to those minimum ages. The marriage is not legal in China because of the population control policy. Congress passed § 601(a)(1) of the IIRIRA to ensure that families who are victims of forced abortion and sterilization under China's population control policy would receive asylum, yet the IJ denied the claim precisely because that population control policy rendered the marriage illegal. That would entirely subvert the Congressional amendment, and deny asylum to anyone whose sterilization or abortion was set in motion by a decision to marry and procreate prior to the minimum age. Where a traditional marriage ceremony has taken place, but is not recognized by the Chinese

government because of the age restrictions in the population control measures, that person nevertheless qualifies as a spouse for purposes of asylum. *Ma v. Ashcroft*, 361 F.3d 553, 558-61 (9th Cir. 2004).

In addition to questioning the marriage, the IJ also held that Zhang failed to establish by credible evidence that his wife had suffered a forced abortion at the hands of the government. The government, to its credit, does not attempt to defend the IJ's determination that Zhang failed to establish that the forcible abortion occurred. Again, the IJ relied on the lack of a statement from the wife or her family, without addressing Zhang's explanation for his inability to obtain such corroboration. The IJ also relied on the lack of any hospital record of the forced abortion. Yet there is no support for the contention that such a hospital record could be obtained. In fact, we have previously addressed this very issue in *Lin v. Ashcroft*, 385 F.3d 748 (7th Cir. 2004). In *Lin*, we discussed the State Department's Profile of Asylum Claims and Country Conditions for China, which reports that the U.S. Embassy and Consulates are unaware of any so-called "abortion certificates." According to Embassy officials, the only document of that nature is one provided only in cases of voluntary abortions, in which certificates are provided to allow the patient to obtain time off work. *Id.* at 753-54. The absence of a hospital certificate, then, provides no reason to doubt Zhang's testimony, and in fact is entirely consistent with that testimony.

Similarly, the alleged contradictions between Zhang's testimony and official country reports are illusory. The IJ relies on a State Department report, concluding that "the State Department is saying that the consequences that a child in Fujian [Province] who is born out-of-wedlock or before the parents were legally eligible to marry would not be forcible abortion, but would rather be a fine or some kind . . . ." IJ Order at 7. The State Department report, however, directly states that it "could not exclude" the

possibility of forced abortions of children of couples with an early marriage. Accordingly, the State Department report does not contradict Zhang's testimony, and the IJ improperly characterized it as such. Moreover, we have repeatedly cautioned that "an IJ should not rely on generalized Profiles or Country Reports to refute an applicant's personal experience." *Dong v. Gonzales*, 421 F.3d 573, 578 (7th Cir. 2005); *Bace v. Ashcroft*, 352 F.3d 1133, 1139 (7th Cir. 2003) ("[I]t would be improper to find that a witness's credibility about specific events could be 'contradicted' by a generalized State Department report broadly discussing conditions in the applicant's country of origin."); *see also Lin v. Ashcroft*, 385 F.3d at 754. That is precisely how the Report was used here. We rejected such a use of the State Department report in a factually-similar case in *Dong*, and we reject it here.

The IJ repeated that error in his use of the report from the Immigration and Nationality Directorate of the U.K.— a report supplied by the IJ himself at the hearing. That report indicated that Fujian Province was less strict in its enforcement of the birth control policies than other provinces except for Guangdong. The IJ concluded that Zhang's testimony was at variance with those authorities, and therefore not credible. Again, however, a general observation concerning a province as a whole cannot be the basis for wholesale disregard of specific testimony by an individual. Moreover, the IJ failed to address in any way the myriad authorities provided by Zhang reaching an opposite conclusion. Included in those were the Chicago Tribune reports and ABC Nightline reports of testimony of Gao Xiao Duan, the official in charge of enforcing the population control measures in a township in Zhang's province (Fujian Province) during a 14-year time period which included the time of the forcible abortion in this case. Gao defected to the United States, bringing with her video and documentary evidence of the strict enforcement of the population control measures, and testified before Congress

as to those population control measures. In the news reports of her testimony, she described at length the measures undertaken in her province to assure compliance with the planned-birth policies, including the forcible abortion of any pregnancies in which the woman lacked a permit for the birth, even where the pregnancy was in the ninth month. Gao noted that women younger than 20 are not authorized to become pregnant and thus cannot obtain that permit. *See also Forced Abortion and Sterilization in China—The View from Inside: Hearings Before the Subcomm. on Int'l Operations and Human Rights of the House Comm. on Int'l Relations*, 105th Cong. 8-12 (1998) (testimony of Ms. Gao Xiao Duan), http://commdocs.house.gov/committees/intlrel/hfa49740.000/hfa49740_0f.htm. In contrast, the general statements from the Immigration and Nationality Directorate of the U.K. were in a 2002 report, at a time subsequent to the abortion at issue here and also subsequent to the aforementioned testimony and ensuing international attention on Fujian Province. *See also Ma v. Ashcroft*, 361 F.3d 553 (9th Cir. 2004) (discussing similar third trimester forced abortion in underage marriage, and citing numerous sources that the policy against early marriages and births is strictly enforced in Fujian Province).

In an attempt to salvage the decision, the government presents alternative grounds for denying asylum in this case. The government argues that even if Zhang suffered past persecution under § 1101(a)(42)(B) to qualify for refugee status, he cannot establish a well-founded fear of future persecution if he returned to China. The IJ did not consider whether Zhang had demonstrated a well-founded fear of future persecution, so ordinarily this would be a matter that we would remand. The government argues, however, that we may decide that issue adversely to Zhang as a matter of law.

In *In re C-Y-Z*, 21 I. & N. Dec. 915, 917 (1997), the BIA held that the spouse of a woman who has been forced to undergo an abortion or sterilization procedure can establish past persecution. Furthermore, the spouse, having demonstrated past persecution, is entitled to a presumption of future persecution. 8 C.F.R. § 208.13(b)(1) (an applicant who has established past persecution "shall also be presumed to have a well-founded fear of persecution on the basis of the original claim.") Because Zhang's wife has remarried, the government argues that he can no longer "bootstrap" onto her claim, and can no longer claim the benefit of the rule that a husband may vicariously assert the injury to his wife. This contention is without merit. At its heart, the government's claim rests on the notion that Zhang suffers no persecution, independent of his wife, as the result of the forcible abortion of his child. Although his wife was certainly a very direct victim of China's population control measures, Zhang was a victim as well. The forcible abortion has deprived him of his unborn child, of the ability to realize the family that his wife and he had desired, and forever deprived him of the ability to become a parent to that unborn son or daughter with his wife. That loss is certainly not lessened by the subsequent break-up of the marriage, because that simply means he may have been deprived of his only chance to parent a child with that former spouse. Given the stress on a relationship that an involuntary abortion or sterilization would produce, it would be particularly perverse for courts to treat a subsequent break-up of the marriage as somehow lessening the impact of that persecution. An argument analogous to the government's theory has been rejected by the BIA and the courts. *Qu v. Gonzales*, 399 F.3d 1195 (9th Cir. 200); *In re Y-T-L*, 23 I. & N. Dec. 601 (2003). The government in those cases argued that a spouse whose wife had been involuntarily sterilized had no fear of future persecution because her involuntary sterilization removed any threat of future sterilization or forcible abortions. That convoluted argu-

ment was properly rejected because it would allow the act of persecution itself to constitute the change in circumstances that would result in the denial of asylum, and would categorically deny asylum to a class of persons that Congress clearly intended to protect. 399 F.3d at 1203; 23 I. & N. Dec. at 605. In rejecting such a claim, the court and the BIA focused on the special nature of the persecution and the need to give full force to the intent of Congress. The BIA emphasized that the act of forced sterilization is not a discrete act, but rather a permanent and continuous form of persecution that deprives the couple of the child or children who might have eventually been born to them. 399 F.3d at 1202; 23 I. & N. Dec. at 607. The BIA held that persons who have suffered involuntary sterilization have a well-founded fear of future persecution because they will be persecuted for the remainder of their lives due to that sterilization. 399 F.3d at 1203; 23 I. & N. Dec. at 607. The *Qu* court noted a similar impact for forced abortions:

> Forced abortion, as a form of persecution, possesses similar unusual characteristics. Again, the pain, psychological trauma, and shame are combined with the irremediable and ongoing suffering of being permanently denied the existence of a son or daughter. Thus, forced abortions, without more, also likely will result in statutory entitlement to asylum eligibility and withholding of removal. In fact, an even stronger argument may exist that the presumption is necessarily rebutted in involuntary abortion cases, because the applicant may still face additional persecution in the future in the form of more forced abortions, involuntary sterilization, and other coercive population control practices.

399 F.3d at 1202 n.8.

That logic applies equally to Zhang. In addition to being permanently denied the existence of that son or daughter with his wife, he remains subject to the same population control measures. That his wife has remarried does nothing

to eliminate that risk. There is nothing in this record to indicate that Zhang has no desire to marry and have children, or that he now agrees with China's population control measures. He is still subject to all of China's population control measures, including the ban on underage marriages and early births, which are still problematic if he marries a woman under that age limit. In fact, if his marriage had remained intact, the government would undoubtedly be arguing that there was no threat of future persecution because they would no longer be under the legal age to have children under those population control measures. This twisted logic has already been rejected by the BIA and the courts. The government has failed to identify any changes that are "fundamental in nature and go to the basis of the fear of persecution." 23 I. & N. Dec. at 605. The mere speculation that Zhang may not run afoul of those population control measures given the break-up of his marriage is insufficient to rebut the presumption of future persecution. The government raises no other argument that Zhang lacks a well-founded fear of future persecution, nor does it suggest that it would raise any other argument if the matter were remanded. Because we reject the government's sole argument that he lacks a well-founded fear of future persecution because of the break-up of his marriage, the government has failed to demonstrate a well-founded fear of future persecution as a matter of law. Finally, the IJ's alternative determination that Zhang would not merit a favorable exercise of discretion even if he were found eligible for asylum, is based on the same erroneous credibility determinations and the improper consideration of the fraud charge withdrawn years earlier. Accordingly, we grant the petition for review, vacate the BIA's denial of withholding of removal and asylum, grant withholding of removal, hold Zhang eligible for asylum, and remand to the Attorney General to exercise his discretion whether to grant asylum.

No. 04-1706                                                                    17

A true Copy:

     Teste:

                                    _____

                                 *Clerk of the United States Court of*
                                   *Appeals for the Seventh Circuit*