# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 04-1689

MARTIN TABAKU and ENTELA BINO,

*Petitioners,*

*v.*

ALBERTO GONZALES, Attorney General
of the United States,

*Respondent.*

---

Petition for Review of an Order of
the Board of Immigration Appeals.
Nos. A79-290-895, A79-290-896

---

ARGUED JANUARY 21, 2005—DECIDED SEPTEMBER 29, 2005

---

Before RIPPLE, WOOD, and SYKES, *Circuit Judges.*

WOOD, *Circuit Judge.* Martin Tabaku and Entela Bino, a married couple from Albania, claim that organized crime factions threatened both of their lives because of their efforts to free women from Albania's sex-slave trade. The couple contend that their lives will be at risk if they are forced to return to Albania. They filed for asylum, withholding of removal, and protection under the United Nations Convention Against Torture. The Immigration Judge (IJ) denied all relief because he concluded that the couple's story was not credible, a ruling the Board of Immigration Appeals (BIA) summarily affirmed. We grant the petition

for review and remand the couple's case to the agency, because there was insufficient evidence to support the IJ's adverse credibility determination.

**I**

Through an interpreter, Martin Tabaku presented the following account to the IJ during the hearing held on October 1, 2002. Entela Bino, his wife, did not testify; instead, she stayed right outside the courtroom with the couple's one-month-old son.

Tabaku testified that before leaving Albania in 2000, he and his wife lived in Korçë, a small city near the Greek border. Active in the local Eastern Orthodox church, the couple began to help women caught in Europe's sex-slave trade. When these women were able to escape their captors, the couple's church would help them travel to their home countries' embassies in either Tirana, the capital of Albania, or in Greece. Tabaku corroborated this account by submitting a number of documents discussing the sex-slave trade in the Balkans and by providing a somewhat vague letter from the church which stated that Tabaku and Bino assisted "the poor and other people in need of help as missionaries of our church."

This work continued in secret and without incident until June 5, 1999. On that day, after bringing a young girl to the Romanian embassy in Tirana, a member of the couple's church group was captured on her way back to Korçë. Tabaku testified that the driver of the car told him that he had seen the woman raped and killed. The driver was allowed to leave, but he was too afraid to report the crime. Tabaku, over the driver's protests, reported the driver's story to the local police. After briefly speaking with some of the officers, Tabaku returned to the woman's home. A few hours later, five police officers and someone Tabaku believed was a member of the Albanian mafia arrived at the

home of the woman who had been killed. The unidentified man approached Tabaku and told him that the woman's murder was a warning to the church to stop interfering in their business. The man left with the police and no investigation was conducted.

Six months later, on December 15, 1999, a young Polish woman arrived at the church. She had been beaten severely, and she desperately wanted to go to the Polish embassy. Tabaku drove her to a sister church in Tirana, returning late in the day. Five days later, five to six police officers arrived at Tabaku's home. They beat him and made him watch as they beat his father. The police then brought Tabaku to the local police station, tied him to a chair, and made him sit in a windowless, unlit cell for hours. Eventually one of the officers, whom Tabaku recognized from the night of the first woman's death, came into the cell and began to threaten and beat Tabaku. Tabaku testified that the man called him a Greek spy, apparently a reference to his membership in the Orthodox church, and demanded that Tabaku tell him "where you take those you kidnap from us." When Tabaku protested that he had done nothing wrong, the officer demanded that Tabaku pay him $30,000. Tabaku replied that he did not have the money, which caused the beatings to resume.

After the officer threatened Tabaku's wife and family, Tabaku offered the officer $3,000, all of the money he had available. The police brought Tabaku back to his house, took the money, and said that they knew where they could find the rest, which Tabaku took as a reference to his wife. When Tabaku got home, he found his wife bleeding, her clothes torn. She explained that with the help of Tabaku's cousin, who happened to have been with her, she had escaped a kidnaping attempt.

A few days later, on Christmas Eve, Tabaku and his cousin were leaving a coffee shop when someone Tabaku

recognized as being from the Albanian mafia opened a car door and shot Tabaku's cousin, killing him. The man turned the gun on Tabaku, but he was able to escape. Tabaku went to the police and gave them the name of the person who he believed had killed his cousin, but they did nothing.

To corroborate the fact of the killing, the petitioners submitted three newspaper articles recounting the murder, although the details reported were not fully consistent with one another. As petitioners' counsel stated in his closing argument, he included the articles "just to show and to document that there was a murder . . . on Christmas Eve, and it involved Mr. Tabaku's cousin . . . [and not to prove] the facts spelled out in that newspaper . . ., because clearly those journalists did not report the incidences that Mr. Tabaku reported."

Tabaku told the IJ that he feared he would be killed if he stayed in Albania because he had identified his cousin's murderer. Tabaku testified that the murderer's family may have also wanted to kill him out of fear that he would attempt to avenge his cousin's death as part of a "blood feud." Fearing for his life and the safety of his family, Tabaku moved with his wife and family from Korçë to Tirana. After receiving a new threat in Tirana, he complained to the police there, but they told him that events in Korçë were outside their jurisdiction.

Afraid and finding no protection from the authorities, Tabaku's brother and father moved to an undisclosed town in Albania. The couple crossed into Greece and eventually arrived in the United States.

The IJ denied the couple's request for asylum, withholding of removal, and relief under the Convention Against Torture because he found that Tabaku's testimony was not credible. (The couple have abandoned their request for relief under the Convention Against Torture by failing to raise it in their opening brief. See, *e.g.*, *Balogun v. Ashcroft*, 374

F.3d 492, 498 n.7 (7th Cir. 2004).) We can glean from the IJ's oral opinion five reasons why he disbelieved Tabaku's testimony. First, the IJ found a "very cardinal error or omission on the part of the respondent, in not presenting his spouse to testify as an occurrence witness as to possible occurrences that took place to her knowledge, . . . which would or may have corroborated the respondent's testimony." Second, the IJ thought that the church's letter in support of Tabaku and Bino was too sparse to support Tabaku's story. In response to Tabaku's argument that the church wanted to keep its anti-sex- trafficking work a secret and therefore was deliberately vague in its letter, the IJ stated, "They would have us believe that a priest or a bishop, when he has a moral and legal obligation to help a parishioner, would refrain to do so, [which] also seems mind boggling." Third, for similar reasons, the IJ did not believe that the driver of the church vehicle carrying the woman who had been raped and murdered would be so afraid to report the crime to the police: "If, in fact, these are Christians who assert their Christian faith, they have not only a moral obligation, but they have a legal obligation to report these incidents." Fourth, the IJ did not believe that Tabaku's father and brother were in hiding. The IJ found it "baffling" that "in this type of community in Albania, where everyone knows where everyone is, that somehow or another, the father and the brother's identity and location [could be] secreted away from this alleged mafia." Finally, the IJ discredited Tabaku's version of his cousin's murder because of the three contradictory newspaper articles the couple submitted with their application. According to the IJ, Tabaku's story was "contradicted by his own documentary evidence, which is also baffling."

## II

The petitioners appeal the IJ's conclusion on two grounds. First, they argue that the IJ infringed their due process

rights by using the verb "badger" to describe the level of intensity allowed during cross-examination, which scared Bino into not testifying. Second and more centrally, they assert that there was insufficient evidence to support the IJ's adverse credibility determinations.

There is no question that non-citizens in the petitioners' position are entitled to due process, see *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001), but we agree with the BIA that the IJ did not impinge those rights here. As the BIA concluded, "while we consider the Immigration Judge's use of that word to be incorrect, we cannot find that the misstatement in question is grounds for finding a due process violation requiring remand and rehearing of the evidence." To establish a due process violation, an asylum petitioner must show that the alleged procedural violation might have made a difference in the outcome of the proceedings. *Shahandeh-Pey v. INS*, 831 F.2d 1384, 1389 (7th Cir. 1987). The couple argues that the use of the word "badger" scared Bino and prevented her from testifying. Their counsel conceded at oral argument, however, that Bino was caring for her child outside the hearing room when the IJ made this statement. Thus, it is unlikely that she even heard the word when it was uttered. Furthermore, the couple have not proffered any evidence that Bino would have provided that would have added materially to Tabaku's testimony.

With the exception of its comment on the petitioners' due process claim, the BIA adopted and affirmed the IJ's ruling without issuing an opinion. See 8 C.F.R. § 1003.1(e)(4). We therefore review the IJ's decision directly. See, *e.g.*, *Lin v. Ashcroft*, 385 F.3d 748, 751 (7th Cir. 2004). To qualify for asylum, the couple must establish that they are "refugees," as defined by the Immigration and Nationality Act (INA). See 8 U.S.C. § 1101(a)(42)(A) (defining "refugee" as "any person who is outside any country of such person's nationality . . . who is unable or unwilling to return to . . .

that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion"). Establishing the right to withholding of removal is more difficult than proving an asylum claim. To receive asylum, the couple need show only that there is a reasonable possibility of future persecution, see *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987); *Ahmad v. INS*, 163 F.3d 457, 460-61 (7th Cir. 1999), but to qualify for withholding of removal, the couple must demonstrate that there is a "clear probability of persecution" upon their return to Albania. See *INS v. Stevic*, 467 U.S. 407, 413 (1984); *Lin*, 385 F.3d at 751.

We review the IJ's conclusions under the substantial evidence standard, meaning they will be upheld so long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *Ahmed v. Ashcroft*, 348 F.3d 611, 615 (7th Cir. 2003). While deferential, the substantial evidence standard is not the functional equivalent of no review at all. "[W]e will not automatically yield to the IJ's conclusions when they are drawn from insufficient or incomplete evidence." *Georgis v. Ashcroft*, 328 F.3d 962, 968 (7th Cir. 2003). IJs must support their credibility determinations with "specific cogent reasons" that "bear a legitimate nexus to the finding." *Ahmad*, 163 F.3d at 461. We cannot uphold credibility assessments unmoored from the record, based on nothing but the IJ's personal speculation or conjecture. See *Korniejew v. Ashcroft*, 371 F.3d 377, 383 (7th Cir. 2004) (citing *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002)).

As noted above, the IJ articulated five reasons why he believed Tabaku was lying. We consider them one at a time. First, the IJ stated that he "must assume" that Bino's failure to testify was part of the couple's trial strategy, having concluded that she would not be able to "withstand

cross-examination." This suggests that the IJ was applying the so-called missing witness rule found in traditional civil litigation, which provides that "when a party can call a witness to shed light on an event, but chooses not to, an inference arises that the witness' testimony, if produced, would be unfavorable." *Multi-Ad Services, Inc. v. NLRB,* 255 F.3d 363, 371 n.1 (7th Cir. 2001). The requirements for the use of the rule are more stringent in criminal cases, see *United States v. Brock*, 417 F.3d 692, 699 (7th Cir. 2005) (before instruction will be given against the government, defendant must show that the witness was peculiarly within the government's power to produce, that the testimony would have shed light on the issues in the case, and that it would not have been cumulative). This rule, however, assumes that the proceeding, whether a civil one or a criminal one, is one that employs the classic adversary system, in which each side is exclusively responsible for presenting its own case. Immigration proceedings, as we have observed in the past, are different:

> An IJ, "unlike an Article III judge, is not merely the fact finder and adjudicator but also has an obligation to establish the record." *Yang v. McElroy,* 277 F.3d 158, 162 (2nd Cir. 2002); see also *Richardson v. Perales,* 402 U.S. 389, 410 (1971) (holding that an administrative law judge acts as "an examiner charged with developing facts").

*Hasanaj v. Ashcroft,* 385 F.3d 780, 783 (7th Cir. 2004).

In these special circumstances, there was no reason for the IJ to draw any inference, positive or negative, from the fact that Bino was sitting outside the room. Had he perceived a gap in the record, she was functionally available to be called at any time and thus was not "missing." The IJ had no basis in the situation presented here for concluding that Tabaku's failure to call her into the room undermined his credibility.

Second, the IJ found the letter from the church too vague to support Tabaku's claim that he was helping women escape from the sex-slave trade. The judge dismissed Tabaku's explanation that the church wanted to keep its work a secret with the observation that the notion that "a priest or a bishop, when he has also a moral and legal obligation to help a parishioner, would refrain to do so, [ ] seems mind boggling." There is certainly no basis in the record to support the IJ's personal belief that an Albanian priest would obviously risk his entire congregation at home by providing a detailed statement of the dangerous role the Church was playing to help the victimized women, just to assist a distant parishioner in his asylum claim. There is a difference between something that merely fails to support a claim and something that affirmatively undercuts the claim. The worst one can say of the church's letter is that it fell in the former category.

Third, and similarly, the IJ did not believe Tabaku's testimony that a church driver would fail to report to the local police his witnessing a rape and murder. Again, the IJ based this conclusion on the fact that the driver was a Christian who (in the IJ's view) had "not only a moral obligation, but . . . a legal obligation to report these incidents." Notwithstanding the IJ's concept of what it means to be a Christian, there is plenty of evidence that even in the United States, where there may be no obvious threat to the witness's life, crimes go unreported. In 2001, for example, the Department of Justice estimated that approximately half (50.6 percent) of violent crimes go unreported. See Department of Justice Bureau of Statistics, Criminal Victimization in the United States, 2001 Statistical Tables, Table 91b, available at http://www. ojp.usdoj.gov/bjs/ pub/pdf/cvus01.pdf. The IJ's assumption that the *driver's* decision not to report the crime somehow undercut Tabaku's version of the events has no basis in hard facts. Witnesses can be intimidated, here as well as in other countries, and

Tabaku provided a convincing reason why this driver may
have been deterred from speaking up.

Fourth, the IJ did not believe that Tabaku's father and
brother were in hiding. The IJ found it "baffling" that "in
this type of community in Albania, where everyone knows
where everyone is, that somehow or another, the father and
the brother's identity and location [could be] secreted away
from this alleged mafia." The government did not present
any evidence to the IJ concerning the Albanian mafia's
omniscience. Tabaku told the IJ that his father and brother
had moved from Korçë to an undisclosed town in Albania.
According to the latest figures, there are 3.6 million people
living in Albania over an area of 28,748 square kilometers
(slightly larger than Maryland). See CIA Factbook, 2005,
a v a i l a b l e    a t    h t t p : / / w w w . c i a . g o v /
cia/publications/factbook/geos/al.html. Absent any informa-
tion in the record to the contrary, we find it entirely
possible that Tabaku's family could escape the Albanian
mafia's detection. Although it is the provenance of the IJ to
determine which plausible explanation is correct, we will
not uphold an IJ's speculative alternative if it has no basis
in the record.

Finally, the IJ discredited Tabaku's version of his cousin's
murder because the three newspaper articles the couple
submitted with their application were contradictory.
Tabaku explained that he submitted the articles solely to
corroborate the fact of his cousin's murder, not the exact
circumstances surrounding the killing. As their counsel
admitted, "those three newspapers, taken by themselves,
contradict one another dramatically." Given the inconsisten-
cies in the articles, it is doubtful that the IJ could distill any
concrete information to compare to Tabaku's version of
events. See *Korniejew*, 371 F.3d at 386 (noting with disfavor
"the increasing reliance by the BIA and IJs upon *perceived*
inconsistencies in testimony and lack of corroboration as the
basis for adverse credibility determinations"). Even if we

were to find that the articles' inconsistencies made Tabaku's testimony less believable, we would not feel confident affirming the removal order on such flimsy grounds. *Cf. Georgis*, 328 F.3d at 970 ("[H]aving found that the other five reasons given by the IJ for discrediting [the petitioner] are either unsupported by the evidence in the record or based on incomplete or improperly excluded evidence, we are not inclined to defer to his credibility determinations on this remaining sixth ground alone.").

The couple's claim failed because the IJ concluded Tabaku was lying. In some cases, we may uphold an IJ's opinion even if we disagree with his adverse credibility determinations, because we find adequate the IJ's conclusion in the alternative that, for example, the petitioner did not show that he was a member of a protected group. We cannot do that in this case. Disbelieving the couple's persecution claims, the IJ concluded the couple fled Albania for "economic reasons." He thus did not "consider the respondent's flight relative to a membership in a particular social group or for political opinion." Since the IJ's opinion did not reach the question whether the petitioners fall within a protected group, but rested almost entirely on an adverse credibility determination that the record does not support, we must vacate the removal order. The couple may or may not have a valid asylum claim, but it is not for us to determine that ultimate question, nor was the BIA entitled to do so based on the flawed record before it.

## III

Because we find insufficient evidence to support the IJ's adverse credibility determination, we GRANT the petition for review, VACATE the removal order, and REMAND for further proceedings consistent with this opinion.

A true Copy:

      Teste:

                        _____
                        *Clerk of the United States Court of*
                           *Appeals for the Seventh Circuit*