UNPUBLISHED ORDER
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued August 2, 2005
Decided October 18, 2005

**Before**

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. ILANA DIAMOND ROVNER, *Circuit Judge*

No. 04-3176

| | |
|---|---|
| ROBERT KIGGUNDU, | Petition for Review of an Order of the |
| *Petitioner*, | Board of Immigration Appeals |
| | |
| *v.* | No. A95-576-826 |
| | |
| ALBERTO R. GONZALES, | |
| *Respondent*. | |

**O R D E R**

Robert Kiggundu, a native and citizen of Uganda, entered the United States using a temporary business visa in September 2001.  More than nine months later, and after he first sought a visa extension, Kiggundu applied for asylum, withholding of removal, and relief under the Convention Against Torture.  The former Immigration and Naturalization Service ("INS") initiated removal proceedings and, after Kiggundu conceded removability, an Immigration Judge ("IJ") denied his application.  The Board of Immigration Appeals ("BIA") summarily affirmed, and Kiggundu petitions this court for review.  We grant the petition.

## I.

Kiggundu, the only witness at his asylum hearing in January 2003, sought asylum because, he alleged, he suffered persecution for supporting an opposition presidential candidate during the March 2001 elections. He testified that he lived in the city of Masaka, Uganda, and worked there as a printer. Before the elections held in March 2001, he printed materials and spoke in favor of presidential candidate Kizza Besigye, and examined voter identification cards on behalf of Besigye to detect forgeries. Then, as now, the Ugandan government was controlled by President Yoweri Museveni's National Resistance Movement ("the Movement"), which took control of the country in 1986 and then in 1995 amended the constitution to outlaw political parties, though in a July 2005 referendum voters supported a return to a multi-party political system. Besigye was himself a member of the Movement and a government official, but he resigned from the government to run against President Museveni on a platform promising reform of the Movement.

Kiggundu, although a member of the outlawed Democratic Party, supported Besigye since no Democratic candidate was permitted to run. The United States Department of State, in its country report for that year, described the March 2001 election as "marred seriously . . . by restrictions on political party activities, incidents of violence, intimidation, fraud, and electoral irregularities" but nonetheless concluded that the outcome "generally reflected the will of the populace." President Museveni won reelection with 69.3 percent of the vote; Besigye was second with 27.3 percent.

Kiggundu testified that on July 7, 2001, he was accosted at his home by three armed members of a local defense unit ("LDU"), the name given units of the Movement's para-military wing. Kiggundu reports being slapped, forced to the ground, stepped on, tied, blindfolded, and placed in the back of a truck for transport to a clandestine detention center. There he was held incommunicado with several other supporters of Besigye until July 17, 2001. During his detention, Kiggundu said, the LDU frequently questioned him about his activities in support of Besigye, about whether he supported President Museveni, and about suspicions that Besigye and his supporters intended to "wage war against the movement." Kiggundu stated that his captors beat him daily with bamboo canes, sticks, and wire, and, on one particular morning when the guards discovered the detainees praying, kicked him, struck him with a cane, slapped him, and hit him about the head and ribs. The detainees were Catholic, the predominant religion of the members of the banned Democratic Party, and Kiggundu reports that the president and most members of the Movement are Protestant.

Kiggundu escaped from his LDU captors on the night of July 17. The truck carrying him and other detainees to another detention center crashed, and he fled into the surrounding countryside. Kiggundu injured his leg in the escape. He

convinced a passerby to take him to a friend's house in the town of Nyendo, which was near the site of the accident. Kiggundu's friend cared for his leg and other injuries, and contacted his wife. Kiggundu remained in Nyendo until July 20, when friends from Kampala moved him to Mpigi, a town about 30 miles from Kampala and 55 miles from his own home in Masaka. Kiggundu visited a doctor on July 23 and in the following weeks secured a Ugandan passport. Kiggundu also reported that while he was in hiding friends told him the police searched for him at his home and also confiscated computers from his office.

From Mpigi, Kiggundu moved to another friend's house in Kansanga, and, on August 23, 2001, he obtained a business visa to visit the United States. He testified that he obtained his visa by telling United States Embassy officials that he had been invited to a printers' trade show in Chicago. He departed Uganda by air without his wife or son on September 3, 2001, traveling to the United States via Ethiopia and arriving in New Jersey on September 5.

Kiggundu testified that, when he arrived in the United States, he was unaware of the process for applying for asylum. Rather than apply immediately, Kiggundu explained, he chose "to settle down and be able and [*sic*] feel comfortable to, to handle the, the asylum application." And though Kiggundu testified at the asylum hearing that he was not conducting business in the United States, he first applied for an extension of his business visa before he applied for asylum. Kiggundu filed his application seeking asylum based on political opinion on June 10, 2002, after the expiration of his business visa on April 4.

Apart from his testimony, Kiggundu also submitted several documents to support his application, including: (1) a June 2002 article from the Ugandan newspaper *The Monitor,* a self-described independent daily, which identifies Kiggundu as a "former Col. Kizza Besigye campaign agent" who "reportedly fled to the United States"; (2) records pertaining to his medical treatment from July 23 to 30, 2001, including notes from July 23 documenting multiple bruises, multiple wounds on the scalp, chest, and back; blunt injuries to the buttocks; a six-inch laceration to the left leg; weakness; and dehydration; (3) an affidavit from a former employer used by Kiggundu to obtain his business visa, in which the employer attests that Kiggundu supported Besigye, that he was a member of Besigye's election task force in Masaka, and that he was "being looked for" since he fled Uganda; (4) copies of his Ugandan passport issued on August 21, 2001, and American visa issued August 23, indicating that he departed Uganda on September 3, left Ethiopia the following day, and arrived in the United States on September 5; and (5) the 2001 State Department country report on Uganda, which confirms instances of human rights abuses committed by LDUs, detention of Besigye supporters at the airport in Kampala, and other instances of arbitrary detention and beatings.

The IJ, though, explicitly found Kiggundu not credible.  Specifically, she noted: (1) "material discrepancies," but mentioned a single example—Kiggundu characterized the length of his detention as "three weeks" in his asylum application but testified at the hearing to a span of 11 days; (2) "vague testimony regarding his opposition to the governing regime in Uganda, specifically regarding his 'speaking out'"; (3) suspicious testimony regarding his ability to depart without resistance from authorities and the precise date and time he left Uganda; and (4) "other troubling aspects," including Kiggundu's use of a business visa to enter the United States, his application for an extension, and his choice to wait until after requesting an extension to apply for asylum.

The IJ went on to find that Kiggundu had not established past persecution. Though prefacing her finding by stating she would "assum[e] arguendo that the Respondent was found credible," the IJ instead reasoned that Kiggundu's testimony was not adequately supported by corroborating evidence.  Next, she concluded that Kiggundu had not established a well-founded fear of future persecution, but this finding appears to rely on a lack of past persecution because the analysis places the burden on Kiggundu to establish his subjective fear is reasonable.  Finally, the IJ found that Kiggundu was not entitled to withholding of removal or relief under the Convention Against Torture.

## II.

Kiggundu makes two arguments here.  First, he contends that the IJ's adverse credibility finding is not supported by substantial evidence because it relies on purported discrepancies that are either illusory or readily explained.  Second, he maintains that there is not substantial evidence to support the IJ's alternative holding that, even crediting his testimony, he did not suffer persecution.  When, as it did here, the BIA summarily affirms the order of an IJ, we review directly that order.  *See Ursachi v. INS*, 296 F.3d 592, 594 (7th Cir. 2002).

### A.  Adverse Credibility Determination

A credibility finding is entitled to "great deference" but still must be supported by "cogent reasons that bear a legitimate nexus to the finding." *Tolosa v. Ashcroft*, 384 F.3d 906, 909 (7th Cir. 2004) (citation and internal quotation marks omitted).  In this case, the IJ's adverse credibility finding is both unsupported by the record and relies on factors that we have explicitly stated cannot support such a finding.

The IJ relied on four aspects of Kiggundu's application and testimony to question his credibility.  She first faulted Kiggundu for "material inconsistences" among his testimony, application, and corroborating evidence, but identified only the length of his detention as being inconsistent.  Even this "inconsistency," though,

is illusory. The IJ observes that Kiggundu incorrectly described the 11-day period from July 7 to July 17 as "three weeks" when he recounted his detention to his doctor and in the narrative accompanying his asylum application. But he consistently specified the very same dates (July 7 to July 17) for his arrest, imprisonment, and doctor visits in his application and testimony. The period of his detention documented in his application is 11 days even if mischaracterized as "three weeks," and at no time has he tried to say that the period was anything but those 11 days. Consequently, although the duration of detention may be material to a finding of persecution, *see, e.g.*, *Asani v. INS*, 154 F.3d 719, 723 (7th Cir. 1998); *Zalega v. INS*, 916 F.2d 1257, 1260 (7th Cir. 1990), the purported "inconsistency" relied on by the IJ amounts to nothing more than "trivial details" that can be "easily explained," *Korniejew v. Ashcroft*, 371 F.3d 377, 387 (7th Cir. 2004).

The IJ next faulted Kiggundu for giving "vague" testimony regarding his opposition to the government and his support of Besigye. An IJ may rely on the observation that an alien's testimony is "vague" to support an adverse credibility determination. *See Demirovski v. INS*, 39 F.3d 177, 181 (7th Cir. 1994). Vague testimony, though, is a concern insofar as it deprives the IJ and the BIA of the ability to determine if an alien's testimony adequately supports the request for relief. *See generally Cao v. Attorney General*, 407 F.3d 146, 159-60 (3d Cir. 2005).

In this case Kiggundu's testimony was not so vague as to leave the IJ uncertain of the nature of his support for Besigye. He testified to using his expertise as a printer and resources to donate "cups, flyers, and brochures that depicted [Besigye's] form agenda," analyzing voter identification cards that the Movement allegedly forged (a service for which he charged the campaign), and speaking about Besigye's platform at social, church, and village gatherings. The government labels this degree of information vague, pointing in particular to one exchange between Kiggundu and his counsel:

> Q: How many occasions approximately [did you speak], and where?
>
> A: Quite a number of, several, any time I got, any chance I got, any platform, be it in a church, be it in a, a gathering on [*sic*] a village, be it on [*sic*] any social gathering in a, a bar where I used to go and socialize. Any chance, any time that would, I would find an audience that would listen to that, I did so.
>
> Q: Okay. . . . [new series of questioning]

Kiggundu's answer, though, is responsive, and if it is incomplete, that appears to be because the government was apparently satisfied and did not investigate the matter further during its cross-examination. The IJ may have considered this testimony vague because of a lack of corroborating evidence (she comments that

Kiggundu "failed to provide sufficient corroborating documentation regarding his speaking out"), but, setting aside the problem of requiring such evidence from an otherwise credible alien, the record does not support the IJ's characterization of Kiggundu's testimony as vague.

Third, the IJ questioned the ease with which Kiggundu left Uganda because, according to the IJ, the 2001 country report "refers to cases of people being stopped at the airport while trying to depart." The IJ does not elaborate or cite a section of the report, but presumably she refers to the report's account of two instances where Besigye or his supporters were stopped at the airport in Kampala, the capital. We, however, have observed that persecutors may allow—even want—their victims to depart, and that allowing a victim to depart "hardly prove[s] lack of persecution." *Hengan v. INS*, 79 F.3d 60, 63 (7th Cir. 1996). More to the point, the IJ ignores Kiggundu's testimony that is consistent with the country report. The report confirms Kiggundu's assertions that the LDU teams are associated with the government, rather than the civil police, and that they detain individuals incommunicado. Thus, as Kiggundu suggested in his testimony, civil immigration officials might not detain an individual sought by an LDU team, because the teams employ secretive measures and operate apart from the civil authorities. Finally, the IJ questioned what she saw as a discrepancy in Kiggundu's testimony about the time of his departure, but the discrepancy is literally whether 5:00 AM Monday morning (before sunrise) fairly can be called Sunday night; Kiggundu testified that he departed at "[f]ive o'clock in the morning Sunday night," while his application gives the time as "Sunday morning 3rd September 2001." September 3, 2001, was a Monday. The IJ's opinion, unsupported by the record, regarding the horological preferences of Ugandans does not merit an adverse credibility finding. *See Tabaku v. Gonzales*, No. 04-1689, 2005 WL 2387497, at *3 (7th Cir. Sept. 29, 2005) ("We cannot uphold credibility assessments unmoored from the record, based on nothing but the IJ's personal speculation or conjecture.").

The IJ last groups Kiggundu's efforts to enter the United States into a single category of "other troubling aspects of the Respondent's claim." Here, the IJ faults Kiggundu for failing to claim past persecution either when he obtained his visa or when he sought to have it renewed, for "lying" about his intention to do business in the United States, and for seeking a business visa rather than applying for asylum at the United States Embassy in Uganda or immediately upon arrival in New Jersey. The unstated inference is that these facts undermine Kiggundu's claim that it was always his intention to seek asylum.

An alien's delay in seeking asylum may weigh against credibility. *See, e.g., Zaidi v. Ashcroft*, 377 F.3d 678, 679, 682 (7th Cir. 2004) (delay of almost five years before filing application negatively impacted credibility); *see also Balogun v. Ashcroft*, 374 F.3d 492, 500-01 (7th Cir. 2004) (alien's failure to seek asylum during first two trips to United States impacted credibility, along with failure to claim

persecution during airport interview conducted upon third arrival). We, however, have disregarded an alien's failure to claim persecution at the first possible moment where irregularities taint the IJ's other bases for finding the applicant not credible. *Huang v. Gonzales*, 403 F.3d 945, 950-51 (7th Cir. 2005) (rejecting adverse credibility finding that was "improper because it relies far too much on [the IJ's] own personal experience and beliefs" even though one ground was alien's failure to mention persecution at initial airport screening interview); *cf. Georgis v. Ashcroft*, 328 F.3d 962, 970 (7th Cir. 2003) (vacating order of removal when five of six reasons for adverse credibility finding were improper or unsupported). On this record, we cannot say that this last ground—Kiggundu's use of a business visa to enter the United States and his failure to immediately seek asylum once in the United States—is alone sufficient to uphold the adverse credibility finding. Accordingly, it was improper for the IJ to premise the denial of relief on an adverse credibility finding.

## B. Past Persecution

The IJ attempted to insulate the denial of relief—premised initially on the adverse credibility finding—by purportedly accepting Kiggundu's testimony and then finding his mistreatment fell below the standard for persecution. The alternative holding is flawed, however, because in fact the IJ never assumed Kiggundu to be truthful, and never analyzed his assertions to determine whether they constituted persecution. Rather, she built on her previous credibility finding by decrying Kiggundu's lack of corroborating evidence.

The government asserts that the IJ did find that Kiggundu's testimony, if believed, describes only mistreatment and not persecution. This reading exaggerates the scope of the IJ's alternate holding. The IJ concluded that Kiggundu "failed to submit sufficient corroborating evidence of his arrest and detention" because, in her view, Kiggundu's medical records were not "credible evidence linking the injuries to his alleged detention" and the newspaper article he submitted did "not state that the Respondent was detained and/or persecuted in Uganda." The tenor of the order consistently faults Kiggundu for not providing stronger evidence to substantiate his testimony.

Setting aside whether Kiggundu's corroborating evidence should have been sufficient—the evidence confirms his account of events and the IJ only vaguely questioned its authenticity—we have repeatedly declined to require corroboration from an otherwise credible alien, *see Dawoud v. Gonzales*, No. 04-1275, 2005 WL 2271907, at *5 (7th Cir. Sept. 19, 2005); *Gontcharova v. Ashcroft*, 384 F.3d 873, 877 (7th Cir. 2004); *Capric v. Ashcroft,* 355 F.3d 1075, 1085 (7th Cir. 2004); *Ahmed v. Ashcroft*, 348 F.3d 611, 618 (7th Cir. 2003). A truly alternate holding should have accepted Kiggundu's testimony and analyzed the likelihood of past persecution based on the events he described; the IJ did neither.

Finally, our case law does not compel the conclusion that Kiggundu suffered mistreatment but not persecution.  *Compare Soumahoro v. Gonzales*, 415 F.3d 732, 737-38 (7th Cir. 2005) (suggesting imprisonment for two weeks, regular beatings, denial of adequate food and water, and loss of job may constitute persecution), *Diallo v. Ashcroft*, 381 F.3d 687, 697-98 (7th Cir. 2004) (six months' unlawful imprisonment, hard labor, physical torture, and expulsion from country consistent with past persecution), *and Bace v. Ashcroft*, 352 F.3d 1133, 1138 (7th Cir. 2003) (finding compelling case of persecution based on physical mistreatment over a month-long period, the assault of a family member, and threats), *with Prela v. Ashcroft*, 394 F.3d 515, 518 (7th Cir. 2005) (being "interrogated at various times by the police, detained for twenty-four hours, harassed for money, and beaten, causing an injury to his hands" does not compel a finding of persecution), *Dandan v. Ashcroft*, 339 F.3d 567, 573-74 (7th Cir. 2003) (finding that three-day detention, a lack of food, and beatings causing facial trauma did not compel finding of persecution), *and Zalega*, 916 F.2d at 1260 (finding that detainment, periodic searches, and arrests were not past persecution).  *See generally Mitev v. INS*, 67 F.3d 1325, 1330 (7th Cir. 1995) (persecution may include "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture").  Thus, the IJ's sole reliance on the absence of corroboration and her failure to characterize the testimony as establishing or falling short of persecution cannot be excused by harmless error analysis.  *See Tabaku,* 2005 WL 2387497, at *6 (IJ's opinion resting entirely on unsupported adverse credibility determination vacated because IJ did not determine whether petitioners fell within protected group); *see also Singh v. Gonzales*, 404 F.3d 1024, 1028 (7th Cir. 2005) (observing harmless error analysis applies to immigration cases).

The petition for review is GRANTED and the case is REMANDED to the BIA for further proceedings.