In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-3245

SAN KAI KWOK and YU YAN YUENG,

*Petitioners,*

*v.*

ALBERTO R. GONZALES,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A77-050-885
No. A77-050-886

ARGUED MAY 4, 2006—DECIDED JULY 25, 2006

Before POSNER, MANION, and ROVNER, *Circuit Judges.*

MANION, *Circuit Judge.* Yu Yan Yueng and her son San Kai Kwok applied for asylum, alleging that Chinese family planning officials forced her to undergo an involuntary abortion. An immigration judge denied the application, finding that Yueng and San Kai were not credible and had not demonstrated either past persecution or a reasonable fear of future persecution. Because the IJ's adverse credibility finding is speculative and not supported by substantial evidence, we grant the petition for review.

**I.**

We take the facts that gave rise to this case from the testimony the petitioners gave at their asylum hearing. Yueng testified at the hearing that she, her adult son San Kai Kwok (who was a minor when he and Yueng applied for asylum in 2000), and her husband Ho Kwok are from Tingjiang, Fujian province, China, where Ho Kwok still resides. She is illiterate, with only two years of primary education. In 1983, after San Kai was born, Yueng submitted to the mandatory implantation of an IUD prophylactic device, but at some unknown time it "slipped out."

Yueng testified that in October 1999 she learned she was pregnant. She went into hiding, she said, to prevent the "brigade" from aborting her pregnancy, and stayed at a cousin's house in the provincial capital of Fuzhou, about "45 minutes by bus" from her own home. She alleged that after one of her cousin's neighbors reported her to the government, "officials from the brigade" began searching for her. She testified that the officials went to her house twice "in February 1999," after she had gone into hiding. Her attorney noticed the impossibility of the dates—that she learned of her pregnancy in October 1999 and authorities consequently began searching for her in February 1999. When her attorney pressed her to clarify the timeline, however, the IJ told him, "She, she answered two times already. Move on to the next question."

That same February, according to Yueng's testimony, her father-in-law informed her that San Kai had been seized and imprisoned by the authorities, both to question him about her whereabouts and to pressure her to come forward. She specified at least twice that this happened in 1999. That same month, she testified, family planning officials came to her house twice trying to find her; on the

second occasion, apparently about a week after she learned that San Kai had been imprisoned, they found her and seized her. In recounting this chronology, however, she specifically testified that the month in question was February 2000. The IJ, now realizing the confusion, attempted to clarify the timeline and asked Yueng whether she was certain that all of the events in question occurred in February 2000. She affirmed that she was sure. When he pointed out that she had first pegged the events as happening in 1999, Yueng replied, "Well, because I'm illiterate I didn't receive a lot of education, and so I have a slip of tongue, and I made a mistake. . . . I did confuse '99 and 2000."

During her cross-examination, the government attorney asked Yueng about her extended family. She testified that she has six siblings, two of whom have two children each, and that her husband also has multiple siblings, but that those brothers and sisters all live in the United States. The government then asked Yueng whether she had an "abortion certificate," to which she replied that "all these certificates were taken away by the officials in our brigade, so I don't have any." Yueng also said that her husband had joined her in hiding. The government pointed out that a letter from Ho Kwok had been offered as an exhibit, but that while he otherwise corroborated her account he said nothing about hiding from authorities—only that he "placed [his] wife in a secret place." Yueng was unable to explain why her husband's letter had not mentioned his own flight from the authorities.

After Yueng testified, San Kai took the stand. He said that on February 1, 2000, during one of his classes at middle school, "some officials from the brigade came . . . to take me away." He said that the officials "locked me up in a, in a dark room, no light, and I, I cry all the time." They ques-

tioned him about his mother's whereabouts, and allegedly treated him harshly: "The first couple days there's no food. They kept high pressure on me and what I could do is just cry." He told the authorities that he did not know where his mother was, even though, he testified, "I knew at that time." He testified that he lost track of time in detention, but that his parents later told him that he had been locked up "for about a week." On cross-examination, the government attorney asked San Kai if he had known where his mother was while he was detained. He answered, contradicting his earlier testimony, that he "didn't know where she was." He explained, "what I met [sic] is that I didn't know where she was. . . . I could not tell them because I didn't know." On redirect, he testified that he knew his mother's whereabouts *after* he was released, but not while he was "locked up." San Kai also testified that his mother "doesn't have the ability to communicate clearly with other people," referring to an apparent speech impediment, and that even he had trouble understanding her.

The IJ then issued his decision, finding that the petitioners were not credible and had failed to show either past persecution or a well-founded fear of future persecution if returned to China. It was "Mrs. Yueng's testimony, as compared to [the written statement attached to her asylum application] that is essentially the basis" for the credibility finding. Her testimony, the IJ noted, was inconsistent both internally and with the written statement attached to her asylum application as well as with her husband's letter.

The first and most important inconsistency identified by the IJ was whether the February of both her son's alleged abduction and her alleged abortion was in 1999 or in 2000—this discrepancy was the "key basis, which this Judge

relies on in finding the respondent's testimony to be incredible." After summarizing Yueng's confusion as to the year and her explanation that she was illiterate, the IJ dismissed that excuse as irrelevant. The IJ considered the discrepancy to be significant: "There is a significant amount of difference between the year 1999 and the year 2000. This Judge is mindful that a mistake could have been made, but this Judge is not convinced that a mistake was made."

Although the IJ characterized this confusion as the "central issue" to his credibility determination, he explained that he would have ruled the petitioners incredible even if Yueng's testimony about the dates had been consistent. The other factors he addressed were a lack of supporting witnesses or documentation such as an abortion certificate, whether Yueng's husband joined her in hiding, whether her son had known her whereabouts while he was detained, where Yueng was taken into custody, whether or not she surrendered herself, and why she and her husband's siblings were able to have multiple children. The IJ also determined that Yueng failed to present necessary corroborating evidence such as an abortion certificate, the results of a physical examination, documentation of a "bona fide" marriage, and testimony or affidavits from family members in the United States.

The BIA summarily affirmed the IJ's decision in December 2004. Petitioners filed a petition for review in this court. When petitioners discovered that a section of the transcript was missing from the administrative record, the BIA *sua sponte* reopened the case, and we granted the parties' joint motion to dismiss the petition for review pursuant to Federal Rule of Appellate Procedure 42. The BIA received and considered the transcripts that had been

omitted, and again adopted and affirmed the IJ's ruling. Yueng and San Kai petition for review of that ruling.

## II.

The only issue on appeal is the IJ's credibility finding. Because Yueng filed her asylum application before the REAL ID Act was passed, Pub.L. No. 109-13, 119 Stat. 231, that statute does not affect the credibility analysis in this case. *See Diallo v. Gonzales*, 439 F.3d 764, 766 n.1 (7th Cir. 2006) (REAL ID Act "allows an IJ to require a credible applicant to provide corroborating evidence in certain circumstances," but not where petitioner filed an "asylum application before May 11, 2005."). Credibility determinations must be supported by cogent and specific reasons and bear a legitimate nexus to the finding. *Gjerazi v. Gonzales*, 435 F.3d 800, 807 (7th Cir. 2006); *Mansour v. I.N.S.*, 230 F.3d 902, 906 (7th Cir. 2000). Those reasons must "go to the heart of the applicant's claim." *Giday v. Gonzales*, 434 F.3d 543, 550 (7th Cir. 2006). We give "substantial deference" to the reasons the IJ gives for a credibility determination, and we will reject such a determination only in "extraordinary circumstances." *Id*. But we have explicitly held that "adverse credibility determinations should not be grounded in trivial details or easily explained discrepancies" because such bases lack the necessary "legitimate nexus to the finding." *Korniejew v. Ashcroft*, 371 F.3d 377, 387 (7th Cir. 2004) (citation omitted). None of the bases relied upon by the IJ in this case constitutes such a legitimate nexus.

### A. Testimonial Inconsistencies

The first (and according to the IJ, most important) reason for his determination was Yueng's vacillation as to whether

the events in question happened in February 1999 or
February 2000. But "adverse credibility determinations may
not be based on minor discrepancies that are easily ex-
plained," *Shtaro v. Gonzales*, 435 F.3d 711, 716 (7th Cir. 2006),
which precisely describes this discrepancy. Yueng, who
communicates poorly, confused the dates but consistently
identified the underlying events as occurring subsequent to
and being the result of her pregnancy in 1999. *See Georgis v.
Ashcroft*, 328 F.3d 962, 968 (7th Cir. 2003) (chronological
inconsistency insufficient to support adverse credibility
finding where petitioner "tried to place the event in ques-
tion in its proper chronology even if she could not calculate
the correct date in our calendar system"). Yueng unambigu-
ously testified that she went into hiding *after* learning in
October 1999 that she was pregnant, making it impossible
that she could have been referring to events in February
1999. Her testimony that she fled in October 1999 is consis-
tent with the written statement she submitted with her
asylum application, which also dates her encounters with
the family planning authorities to February 2000. On appeal,
Yueng attributes her confusion to her illiteracy, poor
education, and general difficulty communicating. The IJ
dismissed her education as an explanation for the error, but
did not address her communicative difficulties or the
obvious fact that February 1999 was a nonsensical date. The
IJ's analysis was therefore insufficient because he did not
"attempt to ascertain whether [the inconsistencies] could be
accounted for." *Shtaro*, 435 F.3d at 716.

The petitioners also argue that the IJ improperly dis-
credited them by relying on an apparent putative discrep-
ancy as to whether Yueng's husband hid from the authori-
ties with her. The IJ wrote that, contrary to Yueng's testi-
mony her husband joined her in hiding at her cousin's
home, her husband "did not accompany her." But the record

contains no basis for this conclusion. Although Ho Kwok's written statement is silent as to whether he joined her in hiding, nothing in it (or elsewhere in the record) contradicts Yueng's testimony that "he went into hiding with me, in my place later." The IJ's assertion that Ho Kwok did not hide with his wife is "unmoored from the record, based on nothing but the IJ's personal speculation or conjecture." *Tabaku v. Gonzales*, 425 F.3d 417, 421 (7th Cir. 2005); *see also Lin v. Ashcroft*, 385 F.3d 748, 755-56 (7th Cir. 2004) ("The IJ's skepticism—utterly unsupported by any facts in the record—with respect to [an element of petitioner's testimony] does not form a valid basis for a negative credibility determination."). The IJ's problematic findings on these issues are sufficiently serious to call into question his adverse credibility determination.

Other inconsistencies that the IJ identified are more substantial, but not significant enough to support the adverse credibility determination. The IJ wrote that Yueng testified that she "was found in Fuzhou City," but he noted that the written statement in her asylum application "indicated that she surrendered herself to the township office[1]." And as the government points out, Yueng testified inconsistently as to the *manner* in which she was taken into custody. At one point in the hearing, she clearly and unambiguously testified that she did not turn herself in; not long afterwards, however, she admitted that she did turn herself in to the authorities in order to secure her son's release. Similarly, as the IJ also noted, San Kai testified

---

[1] Although the IJ characterizes this as an inconsistency between Yueng's testimony and her written statement, he apparently meant to refer to Ho Kwok's written statement, in which Ho Kwok writes that his wife turned herself in to the township office.

inconsistently about whether he knew where Yueng was while he was detained. He testified that he knew where his mother was while he was imprisoned, but during his cross-examination stated that he "didn't know where she was." The IJ was entitled to question the petitioners' credibility based on these inconsistencies, but the other grounds for the adverse credibility finding were too seriously flawed for us to affirm it on this basis. *See Tabaku*, 425 F.3d at 423 (granting petition for review despite inconsistency that made petitioner "less believable"); *Georgis*, 328 F.3d at 970 (in light of five flawed bases for the challenged credibility finding, "we are not inclined to defer to [that finding] on this remaining sixth ground alone").

### B. Irrelevant Facts and Evidence

Petitioners next contend that the IJ relied on irrelevant facts and evidence in finding them incredible. They specifically address the IJ's assertion that Yueng, by conceding that she and her husband have several siblings who have more than one child apiece, inadvertently showed that the one-child policy is not currently enforced "in her village, in her province." We held in *Zheng v. Gonzales*, 409 F.3d 804 (7th Cir. 2005), that where the record provides no details about a petitioner's nieces and nephews, "the childbearing histories of [a petitioner's] siblings and in-laws have only limited relevance to her claim." *Id*. at 810-11. The petitioners correctly point out that the record here does not reflect when Yueng's nieces and nephews were born, so the IJ could not know whether her siblings were even subject at the time to the one-child policy. And even if they were, reports entered into the record reflect that Fujian follows a "one-and-a-half child policy" allowing couples to have a second child if the first is a girl, and that some couples in

Fujian receive official permission to have an additional child regardless. With regard to her husband's siblings, several live in the United States where there obviously is no government mandate limiting one child per family. The IJ's analysis on this point is again "unmoored from the record, based on nothing but the IJ's personal speculation or conjecture." *Tabaku*, 425 F.3d at 421.

### C.  Lack of Corroboration

Finally, the petitioners take issue with the IJ's determination that they were incredible because they did not introduce corroborating evidence to support their claims. Specifically, the IJ criticized Yueng for not submitting "any documents to really establish that there is a marriage that's a bona fide relationship," certification of the alleged abortion, a physician's report to demonstrate that she had an abortion, or supporting affidavits or testimony from family members in the United States. But our precedent precludes the IJ from demanding that they produce such corroboration. Under the applicable pre-REAL ID Act standard an "IJ who denies an asylum claim for lack of corroboration must first make an express credibility finding," as well as "explain why it is reasonable to expect corroboration and explain why the applicant's reason for not supplying corroboration is inadequate." *Diallo*, 439 F.3d 764, 765-66 (citation omitted); *see also Gontcharova v. Ashcroft*, 384 F.3d 873, 877 (7th Cir. 2004). Most importantly, an IJ may not require an applicant to submit irrelevant corroborating evidence. *See Rodriguez Galicia v. Gonzales*, 422 F.3d 529, 537 (7th Cir. 2005); *Huang v. Gonzales*, 403 F.3d 945, 951 (7th Cir. 2005).

The IJ's requests were irrelevant. Whether or not Yueng had a "bona fide relationship" with her husband has no

bearing on whether or not she was subjected to an involuntary abortion, and the IJ did not explain his reasoning to the contrary. And since Yueng's hearing, this court has twice held that the sort of abortion certificate the IJ demanded probably does not exist, and that applicants may not be required to present them. *See Zhang v. Gonzales*, 434 F.3d 993, 999-1000 (7th Cir. 2006); *Lin*, 385 F.3d at 753-54. Indeed, any applicants who *do* present such a certificate may find that it counts *against* their credibility. *See Huang v. Gonzales*, No. 05-1711 (7th Cir., July 14, 2006). And as for the other medical testimony the IJ requested, nothing in the record suggests that it would be possible for Yueng to obtain a physical examination in this country that would corroborate an abortion performed several years earlier. Accordingly, the IJ failed to explain why it was reasonable to require this evidence. *See Diallo*, 439 F.3d at 766. Finally, the IJ neglected to explain why Yueng and San Kai needed family members in the United States to testify on their behalf. Nothing in the record suggests that the petitioners' family members here in the United States were present for, witnessed, or have particular knowledge of the alleged persecution Yueng suffered in China. Without describing *what* corroboration he expected from such witnesses, other than generic "testimony as to the stated persecution experienced by both respondents," the IJ failed to explain why it was reasonable to expect such corroboration. *Id*.

## III.

We hold that the IJ's credibility determination was speculative and lacked substantial supporting evidence. The purported inconsistencies upon which the IJ based his ruling were, for the most part, so inconsequential that the determination cannot be supported even though the IJ identified at least one potentially serious inconsistency. Nor was the IJ entitled to hold the petitioners responsible for failing to produce corroborating evidence, when the evidence the IJ expected to see was irrelevant. The petition for review is

GRANTED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*