**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued October 3, 2006
Decided February 9, 2007

**Before**

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. MICHAEL S. KANNE, *Circuit Judge*

Hon. DIANE S. SYKES, *Circuit Judge*

No. 05-4255

| | |
|---|---|
| TOMORR MYSLYMI, et al., | Petitions for Review of an Order of |
| *Petitioners,* | the Board of Immigration Appeals. |
| | |
| *v.* | Nos. A79-416-962, A79-416-963, |
| | A79-416-964, A79-416-965, |
| ALBERTO R. GONZALES, | A79-416-966 |
| Attorney General of the United States, | |
| *Respondent.* | |

**O R D E R**

Tomorr Myslymi and his family left Albania in August 2001.  When they tried to enter the United States using false German passports, they were detained and placed in removal proceedings.  The Myslymis requested asylum, withholding of removal, and relief under the Convention Against Torture, claiming they would be persecuted if returned to their native Albania because Tomorr Myslymi had worked for the Democratic Party there.  The Immigration Judge ("IJ") found Tomorr not credible and denied the requested relief.  The Myslymis appealed, and the Board of Immigration Appeals ("BIA") remanded to allow their expert witness to testify telephonically.  After hearing the expert's testimony, the IJ reinstated his prior decision.  Again the Myslymis appealed to the BIA, this time without success. The Myslymis now petition for review, contesting the IJ's credibility finding, his

treatment of their expert witness's testimony, and his failure to inform them of their right to withdraw their applications for admission. We deny the petition.

## I.

At the petitioners' first hearing, Tomorr Myslymi testified that he was a member and employee of the Democratic Party of Albania ("DP"). From 1994 to 2001, his job was to drive DP leaders, perform administrative duties, and coordinate campaign activities in the city of Tirana, Albania. Tomorr testified that he left his job—and Albania—after receiving two written threats in the summer of 2001 while preparing for the parliamentary elections held in June and July of that year. The first threat came in June: Someone had broken into his car in the DP headquarters lot and left an unsigned note warning that his and his family's lives would be in danger if he did not cease working for the DP. Then in July he found under the front gate of his home a second unsigned note repeating the same threat. Tomorr explained that he believed the Socialist Party was responsible since he was not having trouble with anyone else and had heard that the Socialist-controlled police force was mistreating other DP drivers. To corroborate Tomorr's testimony, the petitioners submitted Tomorr's DP membership card; a short unsigned article published in a DP newspaper describing how he and his family faced poverty and police brutality under the rule of the Socialist Party; an affidavit from the chairman of the DP branch in Tirana confirming Tomorr's employment with the DP and representing that "elements of the Socialist Party" had threatened his life and were "looking to abuse him"; and an Amnesty International article from 2000 about human rights abuses in Albania. The IJ refused to hear telephonic testimony from Dr. Bernd Fischer, a university professor with expertise in Albanian politics.

In finding Tomorr not credible, the IJ reasoned that his testimony conflicted with the documentary evidence. The IJ also concluded that even if Tomorr's testimony was credited, the unfulfilled threats the petitioners received were not so immediate or menacing as to rise above the level of harassment and were not adequately tied to the Albanian government or a group that it was unable or unwilling to control. And, finally, the IJ reasoned that the petitioners lacked a well-founded fear of future persecution because in its 2001 country report for Albania the State Department had not documented any politically motivated killings or disappearances.

On remand from the BIA, Dr. Fischer testified that although he did not know Tomorr personally and could not confirm his story, he found it believable. Fischer opined that DP drivers in Albania could face harassment, discrimination, and possibly violence, particularly because low-level DP employees do not have bodyguards and the police—which he characterized as controlled by the rival Socialist Party—do not protect members of opposition political parties. Fischer also

opined that threats in Albania should be taken seriously because they are rarely made unless they are meant to be carried out. He noted when he testified in February 2005 that the political climate in Albania had recently deteriorated and that there had been an increase in violence due to the upcoming parliamentary elections then scheduled for July 2005. Dr. Fischer's testimony, however, did not persuade the IJ to alter his assessment of Tomorr's credibility or his and his family's request for relief.

## II.

The petitioners first argue that the IJ's adverse credibility finding is not supported by substantial evidence. The IJ reasoned that Tomorr's testimony about receiving threatening notes was inconsistent with the DP chairman's affidavits, which said nothing about *written* threats. The IJ also perceived multiple inconsistencies between Tomorr's testimony and the DP newspaper article. The article is silent about death threats, and while it recounts that family members were "bruised" by the police, Tomorr himself characterized the article as inaccurate on that point. Tomorr also denied that his family had been struggling with growing debt, as is reported in the article.

An IJ's opinion, as supplemented by the BIA, must be supported by "'reasonable, substantial, and probative evidence on the record considered as a whole.'" *Toptchev v. INS*, 295 F.3d 714, 720 (7th Cir. 2002) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). We accord an IJ's credibility determination substantial deference, *Korniejew v. Ashcroft*, 371 F.3d 377, 382 (7th Cir. 2004), and will overturn it only under "extraordinary circumstances." *Feto v. Gonzales*, 433 F.3d 907, 911 (7th Cir. 2006). As long as the IJ provides "specific, cogent reasons that bear a legitimate nexus to the finding," we will not disturb it. *Id.* (quotation marks and citation omitted). Material discrepancies in an asylum applicant's testimony (those that go to the "heart" of the applicant's claim) will support an adverse credibility finding, but minor inconsistencies will not. *Giday v. Gonzales*, 434 F.3d 543, 550 (7th Cir. 2006).[1]

We agree with the petitioners that Tomorr Myslymi's testimony was not materially inconsistent with the DP official's affidavit. True, the official failed to specify that the threats received by the petitioners were conveyed in writing. But this difference between the two accounts cannot fairly be described as an inconsistency, let alone a material one. "There is a difference between something

---

[1]Our credibility analysis is unaffected by the passage of the REAL ID Act of 2005, *see* Pub. L. No. 109-13, 119 Stat. 231, which governs only cases in which the petition for asylum was filed on or after May 11, 2005. *Ayi v. Gonzales*, 460 F.3d 876, 880 (7th Cir. 2006).

that merely fails to support a claim and something that affirmatively undercuts the claim." *Tabaku v. Gonzales*, 425 F.3d 417, 422 (7th Cir. 2005). The official's affidavit recounts that elements of the Socialist Party had threatened Tomorr's life and were "looking to abuse him." This is consistent with Tomorr's testimony that he and his family had received death threats that they attributed to the Socialist Party. There may well be other problems with the official's affidavit; for one, there is no way to tell whether the official had personal knowledge of the threats to Tomorr or whether he was just repeating what Tomorr told him. But whatever shortcomings the affidavit might have, its omission of a description of the *form* in which the threats were received does nothing to undermine Tomorr's credibility.

Nonetheless, we uphold the IJ's credibility assessment based on the inconsistencies between Tomorr Myslymi's testimony and the newspaper article he submitted. The brief unsigned article is entitled "Who's Making Our Friends Leave Albania?" and purports to explain why the petitioners left the country. But rather than citing death threats, the article attributes their departure to deteriorating living conditions, growing debt, and violence at a political rally. When pressed, Tomorr could not explain why the article identifies his growing debt and reliance on food assistance, rather than death threats, as the motives for his family's departure from Albania. And when asked about the author's claim that Tomorr and his wife had been beaten at a political rally, Tomorr denied that the beating had occurred and speculated that the author had confused him with another person.

It was reasonable for the IJ to discredit Tomorr's testimony based upon the article. *See Huang v. Gonzales*, 453 F.3d 942, 945-47 (7th Cir. 2006) (affirming credibility determination based on a single significant inconsistency); *Selami v. Gonzalez*, 423 F.3d 621, 625-26 (6th Cir. 2005) (applicant's submission of fraudulent article sufficed to support adverse credibility determination); *Qin v. Ashcroft*, 360 F.3d 302, 308 (1st Cir. 2004) ("It is simply common sense that the presence of false testimony and documents submitted to prove a central element of the claim in an asylum adjudication indicates the applicant's lack of credibility." (quotation marks and citation omitted)). When asked whether he vouched for the truth of the article's content, Tomorr stated that he did. But when pressed about the article's inconsistencies with his own testimony, Tomorr proceeded to disavow virtually all of what it says. And the content is not immaterial; the petitioners' motivation for leaving Albania goes to the heart of their claim of persecution. Rather than corroborating Tomorr's claim that his family was threatened with death because of his work for the DP, the article strongly suggests that the petitioners came to the United States for economic reasons. It is no wonder then that the IJ would doubt Tomorr's credibility given that he submitted and vouched for the article but quickly disclaimed its content when it proved unhelpful.

The IJ's alternative ground for decision was also sound. The IJ held that even if Tomorr Myslymi is believed, the threats he recounted failed to establish past persecution or a well-founded fear of future persecution. We have repeatedly held that threats alone rarely will compel a finding of past persecution. *See Bejko v. Gonzales*, 468 F.3d 482, 486 (7th Cir. 2006); *Hernandez-Baena v. Gonzales*, 417 F.3d 720, 723 (7th Cir. 2005); *Boykov v. INS*, 109 F.3d 413, 416 (7th Cir. 1997). The two anonymously penned death threats Tomorr described were not of such an immediate and menacing character that a finding of past persecution would have been compelled. *See Bejko*, 468 F.3d at 486; *Ahmed v. Ashcroft*, 348 F.3d 611, 616 (7th Cir. 2003); *Hernandez-Baena*, 417 F.3d at 723; *Boykov*, 109 F.3d at 416. Tomorr conceded that he was never physically harmed, nor did he ever see or speak with the author of either note. And nothing in the record compels the conclusion that the author actually intended to follow through on the threats. Accordingly, the IJ's finding that the petitioners did not suffer persecution is supported by substantial evidence.

The IJ's conclusion that the petitioners do not have a well-founded fear of future persecution is also supported by substantial evidence. The petitioners argue that the IJ unreasonably discounted Dr. Fischer's testimony in favor of a State Department report and that when Fischer's testimony is properly credited, the evidence compels the conclusion that they have a well-founded fear of future persecution.

When an expert witness can provide specific, detailed testimony about the type of risks a particular individual will face, it can be more valuable than the broad assessments contained in a State Department report. *See Gramatikov v. INS*, 128 F.3d 619, 620 (7th Cir. 1997) (recommending that asylum applicants "point to a highly credible independent source of expert knowledge" to contradict State Department reports); *Galina v. INS*, 213 F.3d 955, 959 (7th Cir. 2000) (noting that the country reports are "brief and general, and may fail to identify specific, perhaps local, dangers to particular, perhaps obscure, individuals"). But Fischer's testimony was generalized, and he admitted that he did not know the petitioners. The only specific information he provided were two stories, one about a DP driver in London who was asked to be a spy for the Socialist Party and another about a DP driver for the Attorney General of Albania who was killed in an apparent assassination attempt on his passenger. While Fischer also testified that low-level DP employees may be at greater risk of harm because they lack the protection a high-profile politico might receive, he could not identify any individual who had been targeted or harmed as a result of holding a low-level position. In short, Fischer's testimony was speculative and provided no insight into any specific threat that the petitioners might face upon return. The IJ chose to rely instead upon the most recent State Department reports, which indicated that "there are no indications of systemic political persecution," nor any confirmed reports of

politically motivated killings, disappearances, or detentions in Albania  *See* BUREAU
OF DEMOCRACY, HUMAN RIGHTS & LABOR, U.S. DEP'T OF STATE, ALBANIA: PROFILE OF
ASYLUM CLAIMS AND COUNTRY CONDITIONS 3 (2004); BUREAU OF DEMOCRACY,
HUMAN RIGHTS & LABOR, U.S. DEP'T OF STATE, ALBANIA: COUNTRY REPORTS ON
HUMAN RIGHTS PRACTICES (2004), *available at*
http://www.state.gov/g/drl/rls/hrrpt/2003/27820.htm.  The IJ was not obligated to
discuss Dr. Fischer's contrary opinion predicting the petitioners' fate based largely
on Tomorr's own story, which the IJ disbelieved.

Moreover, subsequent events further undercut Dr. Fischer's views.  When he
testified in February 2005, Fischer warned of increasing violence because of the
parliamentary elections scheduled for July 2005.  But in fact the most recent
country report for Albania states that in 2005 there were no politically motivated
deaths, disappearances, or detentions.  *See* BUREAU OF DEMOCRACY, HUMAN RIGHTS
& LABOR, U.S. DEP'T OF STATE, ALBANIA: COUNTRY REPORTS ON HUMAN RIGHTS
PRACTICES (2006), *available at* http://www.state.gov/g/drl/rls/hrrpt/2005/61633.htm.
And having gained control of parliament in the 2005 elections, the DP is now in
power, *see* BUREAU OF DEMOCRACY, HUMAN RIGHTS & LABOR, U.S. DEP'T OF STATE,
BACKGROUND NOTE: ALBANIA (2006), *available at*
http://www.state.gov/r/pa/ei/bgn/3235.htm; *Cecaj v. Gonzales*, 440 F.3d 897, 900 (7th
Cir. 2006), which strongly suggests that the petitioners are unlikely to be
mistreated upon return.  Accordingly, the IJ's conclusion that the petitioners do not
have a well-founded fear of persecution is supported by substantial evidence.

Finally, the petitioners argue that they were denied due process by the IJ's
failure to inform them of their right to withdraw their applications for admission.
*See* 8 U.S.C. § 1225(a)(4); 8 C.F.R. § 1240.11(a)(2).  But they did not raise this issue
with the BIA.  If the BIA is capable of addressing a due process challenge, then an
alien must raise it with the BIA before we will consider it.  *Feto*, 433 F.3d at 912.
Here the petitioners challenge the IJ's failure to follow the Department of
Homeland Security's rules; this is precisely the type of procedural failing that the
BIA is capable of assessing.  *See id.*  The petitioners failed to raise this issue to the
BIA, so we will not consider it.

For the foregoing reasons, we DENY the petition for review.